**DEPARTMENT OF ECONOMIC DEVELOPMENT, Plaintiff,**

v.

**ARTHUR ANDERSEN & CO. (U.S.A.), Arthur Andersen & Co. (Republic of Ireland) and Arthur Andersen & Co. (United Kingdom), Defendants.**

**No. 85 Civ. 1292(CES).**

United States District Court, S.D. New York.

March 8, 1988.

On Motion to Certify for Interlocutory Appeal April 5, 1988.

**1468**

Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, for plaintiff; Malcolm R. Schade, Robert Sidorsky, of counsel.

Breed, Abbot and Morgan, New York City, for defendants; James D. Zirin, James J. Sabella, Adrian V. White, Alan J. Sorkowitz, of counsel.

## MEMORANDUM DECISION

STEWART, District Judge:

Plaintiff Department of Economic Development ("DED"), an agency of the British government operating principally in Northern Ireland, brings this securities fraud action against defendants Arthur Andersen & Co. (USA) ("AA–US"), Arthur Andersen & Co. (Republic of Ireland) ("AA–Ireland") and Arthur Andersen & Co. (United Kingdom) ("AA–UK"). Defendants are affiliated accounting firms.[1] Plaintiff alleges that defendants certified fraudulent financial statements of various corporations controlled by John Z. DeLorean ("DeLorean"), and thereby committed primary violations and aided and abetted violations of section 10(b) of the Securities Exchange Act of

1934, 15 U.S.C. 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. Plaintiff also asserts various common law fraud and breach of contract claims, as well as a claim based on civil RICO, 18 U.S.C. § 1964. Defendants now move to dismiss the complaint on several grounds.

## I. BACKGROUND

DED's predecessors in interest, the Northern Ireland Development Agency ("NIDA") and the Department of Commerce ("DOC") were agencies of the British government empowered to extend loans and grants to businesses for the purpose of promoting industrial development in Northern Ireland.[2] On July 28, 1978, NIDA and DOC entered into a contract with the DeLorean entities[3] entitled "Master Agreement," which spelled out the contracting parties' rights and obligations with respect to the development and manufacture of the DMC–12 sports car. See Plaintiff's Exhibit 1 (hereinafter "Master Agreement"). The car was to be manufactured in Dunmurry, an economically depressed area in Northern Ireland. The principal DeLorean entities and their respective roles will be briefly summarized here. The DeLorean Motor Company ("DMC") was incorporated in 1975 under the laws of Michigan for the purpose of developing, manufacturing, and marketing the DMC–12 sports car. John Z. DeLorean was Chairman of the Board and Chief Executive Officer of DMC. The manufacturing work on the car was performed at the plant of DeLorean Motor Cars Limited ("DMCL") the Northern Ire-

---

1. Plaintiff alleges in its complaint that defendants are part of a "unitary worldwide partnership." Complaint ¶ 3. Defendants claim that AA–US, AA–UK, and AA–Ireland are separate partnerships. The parties have submitted for our in camera review documents that memorialize various agreements between firms using the Arthur Andersen name. These documents raise an issue of material fact as to whether defendants are part of one global partnership. We cannot resolve this disputed issue on a motion for summary judgment. In any event, our resolution of the various grounds for summary judgment raised by defendants in their motion does not depend on whether defendants are separate firms or a single partnership.

2. On or about September 1, 1982 DOC succeeded by statute to all of the properties and rights of NIDA, which was subsequently dissolved. In turn, on September 6, 1982 plaintiff DED succeeded by statute to all of the functions, properties and rights of DOC, which was dissolved on that date. Complaint ¶ 1.

3. The Court shall use the term "DeLorean entities" when referring collectively to DeLorean and the corporations controlled by him described below.

land Subsidiary of DMC. The common stock of DMCL was owned by DMC, and the preferred stock was owned by NIDA. After the Master Agreement was signed, another entity, DeLorean Research Limited Partnership ("DRLP"), was formed on September 22, 1978, to raise money for research and development of the car. DMC was the sole general partner of DRLP.

In the Master Agreement NIDA and DOC agreed, *inter alia,* to purchase all of the 17,757,000 preferred shares of DMCL stock at one British pound per share. As discussed at greater length in section III(B) below, the certificates of this stock were delivered at the closing of the Master Agreement, although NIDA was to pay for the shares in a series of "calls" to be made at DMCL's discretion. NIDA and DOC also agreed to extend a variety of grants, loans, and loan guaranties to DMCL up to a maximum of £44,936,000. Master Agreement at 12–13, 15; Appendix F to the Master Agreement, § 1. To protect these investments, the Master Agreement provided that NIDA would appoint DMCL's financial comptroller, and that DMC would "use its best endeavors" to insure that the boards of directors of DMCL and DMC each included two NIDA appointees. Master Agreement at 7, 11. In addition, NIDA was given the right under certain circumstances to compel DMC to purchase NIDA's DMCL stock. In March 1980, this latter right was replaced by an amendment to the Master Agreement which gave NIDA the right to convert its DMCL preferred stock into seven million shares of DMC common stock.

Pursuant to the Master Agreement, DMC and another DeLorean–controlled corporation, the John Z. DeLorean Corporation ("JZDC")[4] undertook to furnish to NIDA and DOC "within 120 days following the end of [DMC's] fiscal year ... a consolidated balance sheet as of the end of such fiscal year and a consolidated statement of income for such year, together with notes thereto and the report thereon of DMC's auditors." Master Agreement at 9. These "Consolidated Financial Statements" encompassed DMC and its subsidiaries, including DMCL. Defendants, as DMC's auditors, prepared reports certifying the Consolidated Financial Statements. These reports were issued in this country by either AA–US's Detroit or New York offices. The first report, which certified the Consolidated Financial Statement covering the nine-month period ending August 31, 1978, was issued on November 20, 1978.[5]

The gravamen of the complaint is that DMC's Consolidated Financial Statements were false and misleading, and that by issuing reports certifying these statements, defendants substantially assisted DeLorean and others in the execution of a fraudulent securities scheme. According to plaintiff, defendants' reports misrepresented or failed to disclose various questionable business transactions involving the DeLorean entities. Principally, plaintiff alleges that defendants inadequately investigated a November 1, 1978 contract between several of the DeLorean entities and GPD Services, Inc. ("GPD"), a Panamanian corporation not related to any of the DeLorean entities. Plaintiff contends that GPD performed none of its obligations under this contract, and that GPD instead was used by DeLorean to siphon money from DRLP and DMCL.

Amid allegations of mismanagement and fraud, the DeLorean entities began to collapse in 1981–82. DMCL was placed in receivership on February 19, 1982. DMC filed a petition for reorganization under Chapter 11 of the Bankruptcy Code on October 25, 1982. In December 1983 this

---

**4.** At all times relevant to this lawsuit, 83% of DMC's stock was owned by JZDC, a Michigan Corporation which later changed its name to the DeLorean Manufacturing Corporation. This corporation is only peripherally involved in the facts relevant to this motion.

**5.** The remaining reports were issued as follows: 1) on February 20, 1979, certifying the fiscal 1978 Consolidated Financial Statement; 2) on March 12, 1980, certifying the fiscal 1979 Consolidated Financial Statement; and 3) on February 23, 1981, certifying the fiscal 1980 Consolidated Financial Statement. DMCL did not issue separate audited financial statements until March 1980.

proceeding was converted into a liquidation case under Chapter 7 of the Bankruptcy Code. Plaintiff estimates that it suffered $80,000,000 in damages as a result of the DeLorean entities' demise.

Defendants now move to dismiss the complaint on three grounds: 1) lack of subject matter jurisdiction, Fed.R.Civ.P. 12(b)(1); 2) failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6); 3) forum non conveniens. In the alternative, defendants move for an Order staying this action pending the resolution of plaintiff's action against defendants in the courts of the United Kingdom.

## II. SUBJECT MATTER JURISDICTION

The parties agree that the purchase of securities in this case occurred abroad. Defendants claim that this court lacks subject matter jurisdiction under the federal securities laws because plaintiff has failed to show that defendants' acts (or culpable failures to act) in the United States directly caused plaintiff's alleged loss. In deciding this issue, we shall consider materials outside the pleadings submitted by the parties. *See Kamen v. American Telephone & Telegraph Co.*, 791 F.2d 1006, 1011 (2d Cir.1986).

Neither the text nor the legislative history of the securities laws indicate when federal courts have jurisdiction over claims arising from extraterritorial transactions. *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 993 (2d Cir.), *cert. denied*, 423 U.S. 1018, 96 S.Ct. 453, 46 L.Ed.2d 389 (1975); *see also Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 29–30 (D.C.Cir.1987). In the absence of statutory guidance, the Second Circuit has formulated a broadly-worded standard for determining when domestic conduct that is alleged to have assisted in the perpetration of a securities fraud on investors outside this country will activate federal jurisdiction.

The Second Circuit has declined jurisdiction over alleged violations of the securities laws when the domestic conduct that was the ostensible basis of jurisdiction was "merely preparatory" to the alleged fraud, or amounted simply to a "failure to prevent fraudulent acts where the bulk of the [fraudulent] activity was performed in foreign countries". *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1018 (2d Cir.1975); *Bersch*, 519 F.2d at 992–93. However, if conduct here "directly caused" losses to investors abroad, the Second Circuit has held that jurisdiction will lie in federal district court. *See AVC Nederland B.V. v. Atrium Investment Partnership*, 740 F.2d 148, 153–54 (2d Cir.1984). This standard requires a case-by-case analysis. *IIT, an International Investment Trust v. Cornfeld*, 619 F.2d 909, 918 (2d Cir.1980); *Fund of Funds, Ltd. v. Arthur Andersen & Co.*, 545 F.Supp. 1314, 1350 (S.D.N.Y.1982).

As noted above, plaintiff bases its claim on the defendants' preparation of reports on the fiscal 1978, 1979, and 1980 Consolidated Financial Statements of DMC and its subsidiaries, including DMCL. Plaintiff claims that defendants' certification of these statements was a direct cause of its losses. We hold that actions taken in this country by AA–US with respect to the Consolidated Financial Statements, and the interdependent nature of the DeLorean entities, provide sufficient bases for our jurisdiction over this case.

While most of the field work performed for the audit of DMC and its subsidiaries was conducted in the United Kingdom and the Republic of Ireland by AA–UK and AA–Ireland, ultimate "engagement partner responsibility" for the audit of DMC and its subsidiaries resided first in AA–US's Detroit offices and later in its New York offices. *See* Plaintiff's Exhibit 102. Plaintiff has submitted numerous documents and "Interoffice Communications" from AA–US to AA–UK and AA–Ireland that indicate a greater supervisory role on the part of AA–US than mere ratification of the overseas audit work. *E.g.,* Plaintiff's Exhibits 10, 11, 28, 31, 44, 51, 74, 82, 83.

Plaintiff has brought forth evidence showing that specific instructions concerning audits of DMCL were issued from this country by AA–US. Some of these instructions were very detailed. Plaintiff's Exhibits 10, 74, 83. Upon completion of the field work abroad, AA–UK or AA–Ireland would

send to the Detroit or New York office of AA–US "Interoffice Clearances" or "Interoffice Opinions" for use by AA–US in preparing and issuing the reports on the Consolidated Financial Statements. *See* Plaintiff's Exhibits 66, 75. AA–US did more than synthesize this information, and often conducted additional investigation spurred by Interoffice Opinions received from AA–Ireland and AA–UK. *See, e.g.*, Plaintiff's Exhibits 44, 123.

 AA–US claims that its supervision of AA–UK and AA–Ireland was minimal, and that all significant action on the audit of DMCL was taken overseas. The documents cited above contradict this assertion. However, even if it did not supervise AA–UK and AA–Ireland as closely as these documents suggest, AA–US still may have subjected its conduct to this court's jurisdiction simply by incorporating AA–UK's and AA–Ireland's audits of DMCL into its reports on the Consolidated Financial Statements. By incorporating these audits, AA–US created a duty to supervise under generally accepted auditing standards. AICPA, Codification of Statements on Auditing Standards, AU §§ 543.03, 543.12–13. The breadth of that duty turns on certain factual issues, such as the extent of AA–US's knowledge of AA–Ireland's and AA–UK's procedures and general auditing competency, that cannot be determined on the basis of the evidence before us. However, plaintiff has raised an issue of material fact as to whether AA–US's alleged breach of its supervisory duty might have "directly caused" plaintiff's losses.

DMCL's close relationship with its American parent, DMC, reinforces our decision to exercise subject matter jurisdiction. *See IIT, an International Investment Trust v. Cornfeld*, 619 F.2d 909 (2d Cir.1980). In *Cornfeld*, the court found that debentures issued by a Netherlands subsidiary of an American corporation "in substance were American rather than foreign securities" in part because of the high degree of identity between subsidiary and parent. *Id.*, at 920.

Here, as in *Cornfeld*, the shares of the subsidiary were convertible into the shares of the parent at the option of the purchaser. *Id.* at 919–20. Moreover, at the time the Master Agreement was executed, DMCL was a newly formed company with no operating history. It is thus highly likely that NIDA and DOC based their investment decision on the reputation and experience of the American management of DMC, which controlled every facet of DMCL's operations. Finally, DMC's SEC Form 10–Q, which incorporates the Consolidated Financial Statements, shows that most of DMC's working capital came from NIDA and DOC. Plaintiff's Exhibit 81 at 9.

The interdependency of the two companies was recognized by Andersen itself. In a March 6, 1981 Interoffice Communication, employees of AA–US wrote of DMCL:

> This is essentially a one project company. Almost all of the financing (including the parent financing) is provided by NIDA and DOC. The two companies (DMC and DMCL) are totally interdependent and DMC has no significant operations of its own, other than the U.S. marketing of the car manufactured by DMCL. As a further example of this interdependency, the SEC has accepted the Company's decision to exclude parent company statements although technically required by Regulation S–X.

Plaintiff's Exhibit 78 at 2; *see also* Exhibit 70 at 3–4; Exhibit 79 at 3; Exhibit 72 at 2.

Plaintiff has brought forth evidence tending to show that domestic conduct in the formulation of AA–US's reports on the Consolidated Financial Statements was a direct cause of its alleged losses. Standing alone, this conduct is sufficient to activate subject matter jurisdiction. Plaintiff has also demonstrated a high degree of symbiosis between DMC and DMCL, which provides additional justification for our exercise of jurisdiction. Defendants' motion to dismiss on this ground is denied.[6]

---

6. Defendant has apparently dropped its claim that this court lacks in personam jurisdiction over AA–UK and AA–Ireland. *Compare* Defendants' Memorandum in Support of Motion to Dismiss at 66 *with* Defendants' Reply Memorandum in Support of Motion to Dismiss, and Defendants' Rebuttal Memorandum in Support of Motion to Dismiss. In any event, we find that

## III. FAILURE TO STATE A CLAIM

Defendants move to dismiss under Fed. R.Civ.P. 12(b)(6) on several grounds. Because both sides have submitted matters outside the pleadings, we shall dispose of this portion of defendants' motion as we would a motion for summary judgment. Fed.R.Civ.P. 12(b).

### A. *Instruments Qualifying As Securities*

In its complaint, plaintiff asserts that four instruments, namely "[t]he Master Agreement, the DMCL Preference Stock, the NIDA Put, and the DRLP Interests all constituted 'securities.'" Complaint ¶ 126.[7] Defendants do not contest that the DMCL stock qualifies as a security, but they claim that the Master Agreement and the NIDA put option[8] do not. Defendants also claim that plaintiff does not have standing to assert a securities fraud claim arising from the DRLP interests, because neither NIDA nor DOC were purchasers of DRLP interests. This latter assertion is clearly correct, *see Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 747, 95 S.Ct. 1917, 1931, 44 L.Ed.2d 539 (1975), and is not contested in plaintiff's submissions. It is equally clear that the put option is a security, *see Blue Chip Stamps*, 421 U.S. at 751, 95 S.Ct. at 1932; *Savino v. E.F. Hutton & Co.*, 507 F.Supp. 1225, 1235 (S.D. N.Y.1981), and defendants do not renew their argument to the contrary in either their Reply Memorandum in Support of Motion to Dismiss or their Rebuttal Memorandum in Support of Motion to Dismiss.

Whether the Master Agreement qualifies as a security is a more difficult question.

Plaintiff claims that the Master Agreement is a security because it is an investment contract. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946). The Supreme Court has established a five-part test for determining whether an instrument or transaction is an investment contract. "[A]n investment contract ... means a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of the promoter or a third party," *Howey*, 328 U.S. at 298–99, 66 S.Ct. at 1102–03, and [5] risks loss, *Marine Bank v. Weaver*, 455 U.S. 551, 557–59, 102 S.Ct. 1220, 1224–25, 71 L.Ed.2d 409 (1982). The first and fifth criteria are obviously satisfied here. NIDA and DOC invested significant amounts of money in DMCL. The high risks of the venture were clearly detailed in a report by the McKinsey Consulting Firm issued on July 18, 1978. *See* May 10, 1985 Affidavit of James D. Zirin, Exhibit G at 3.

▬▬ Plaintiff has proffered sufficient facts concerning the remaining criteria to defeat defendants' motion on this issue. Neither the Supreme Court nor the Second Circuit have stated what types of business relationships will satisfy the "common enterprise" requirement, *Connors v. Lexington Insurance Co.*, 666 F.Supp. 434, 440 (E.D.N.Y.1987), and courts in this District

---

we have in personam jurisdiction over these defendants. Section 27 of the Securities Exchange Act, 15 U.S.C. § 78aa, which provides the statutory basis for our exercise of jurisdiction in this case, extends the courts' jurisdiction to the limits of due process. *Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1340 (2d Cir.1972). Because partners of AA–UK and AA–Ireland travelled several times to the Southern District of New York to transact business related to the audit of the DeLorean entities, they are subject to this court's jurisdiction. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 58–59 (2d Cir.1985); Restatement (Second) of Conflict of Laws § 35 (1971).

**7.** In its initial Memorandum in Opposition to Motion to Dismiss, plaintiff asserts for the first

time that the loans and loan guarantees extended by NIDA and DOC were equivalent to promissory notes, and therefore qualify as securities. This claim is dropped in plaintiff's subsequent submissions. In any case, we find that this analogy is inapt, and will not give rise to a separate cause of action arising from the loans or loan guarantees.

**8.** Under the Master Agreement as originally executed, NIDA had the option to "put" to DMC all of its shares of DMCL stock at a price established by a pre-determined formula. In March 1980, NIDA gave up this right to realize cash for its shares in return for a new put option allowing it to convert its DMCL stock into DMC stock. These two put options are discussed at greater length in section III(B)(2) below.

have divided on the issue, *see Cahill v. Contemporary Perspectives, Inc.,* [1986–87 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 92,720 at 93,490 (S.D.N.Y.1986) (collecting cases) [Available on WESTLAW, 1986 WL 4696]. Some courts have found that there must be a "pooling of the monies of various investors." *See Darrell v. Goodson,* [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,349 at 97,325 (S.D.N.Y.1980) [Available on WESTLAW, 1980 WL 1392]. This requirement, known as "horizontal commonality," is not satisfied by a transaction solely between a promoter and a single investor. Other courts have found that such a one-to-one relationship is sufficient, provided that the promoter and the investor share the successes and failures of the venture. This requirement, known as "narrow vertical commonality," is met by a showing of "a tie between the fortunes of the investor and the investment's promoter such that these fortunes rise and fall together." *In Re Gas Reclamation Inc. Securities Litigation,* 659 F.Supp. 493, 500 (S.D.N.Y.1987). Finally, some courts have gone even further and found that the promoter's fortunes need not be linked with the investor's. Under this requirement of "broad vertical commonality," the plaintiff need show only that the fortunes of the investors are tied to the efforts of the promoter. *See Troyer v. Karcagi,* 476 F.Supp. 1142 (S.D.N.Y.1979).[9]

■■■ We agree with the body of authority holding that either horizontal or narrow vertical commonality satisfies the "common enterprise" requirement. *See In Re Gas Reclamation,* 659 F.Supp. at 500–01; *Savino,* 507 F.Supp. at 1237. In this case, plaintiff has demonstrated horizontal commonality. While each of the DeLorean entities was responsible for a different stage of the development, manufacture, and marketing of the DMC–12 sports car, they were all controlled by Mr. DeLorean, and they shared management personnel. Therefore, all the investors in these various entities essentially pooled their investments in an integrated business venture. Even if the venture is atomized into coordinated but separate business ventures, plaintiff has demonstrated narrow vertical commonality between NIDA and DOC and the promoters of the DMCL. These promoters were DeLorean and the other officers of DMC. The fortunes of NIDA and DOC were tied to those of DeLorean and DMCL's management, so that both sides shared in the successes and failures of the venture.

Whether or not NIDA and DOC expected to make a profit from their investment in DMCL—the third factor in the investment contract test—is closer question. NIDA's and DOC's participation in the venture was motivated in large part by the British government's desire to promote investment in Northern Ireland. In *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849, 95 S.Ct. 2051, 2059, 44 L.Ed.2d 621 (1975), the Supreme Court held that a purported investment contract from which one could expect to derive only a non-monetary benefit is not a security. Therefore, a "return" on NIDA's and DOC's investment consisting of increased employment and prosperity in Dunmurry does not bring the Master Agreement within the ambit of the securities laws. The main obstacles contained in the Master Agreement blocking NIDA's and DOC's realization of profit were the extensive employment and capital grants to DMCL. The size of the grants was contingent upon the maintenance of certain employment levels, and DOC reserved the right to require repayment if these levels were not reached. Master Agreement, Exhibit F at 1–4. If the levels were reached, the grants would become large, unrecoverable expenditures. In either case, the grants would yield no direct monetary return to NIDA and DOC.

However, the Master Agreement does not on its face preclude the realization of profit by NIDA and DOC. At the time the Master Agreement was signed, it apparently was unclear whether monies expended as grants would be recouped from income

---

**9.** We agree with those courts that have criticized this final approach as inconsistent with *Howey.*

*See Savino,* 507 F.Supp. at 1238 n. 11.

■■■

realized by NIDA and DOC from dividends, interest on loans, royalties, and stock sales. Though it appears that NIDA and DOC were prepared to lose money, it also appears that they could garner a profit if the venture was successful. The *Howey* Court recognized that an investment contract may involve a speculative profit. *Howey*, 328 U.S. at 301, 66 S.Ct. at 1104. Therefore, on the basis of the evidence before us, we cannot say as a matter of law that NIDA and DOC could not reasonably expect to reap a profit from the Master Agreement.

Finally, defendants argue that the Master Agreement did not place control "solely" in the hands of DMCL's management, as required by *Howey*. Defendants point out that NIDA was allowed to appoint DMCL's comptroller, and appoint two members each to the boards of directors of DMC and DMCL. They also claim that NIDA's and DOC's financial commitments gave them control over DMCL's management. However, plaintiff has submitted evidence suggesting that in practice NIDA adopted a "hands off" policy with respect to the management of DMCL. *See, e.g.,* July 31, 1985 Affidavit of Anthony Strother Hopkins, ¶ 13.

*Howey*'s requirement that the expected profits be derived "solely" from the efforts of others has not been construed literally, but rather in light of "economic realities." *S.E.C. v. Aqua–Sonic Products Corp.,* 687 F.2d 577, 582 (2d Cir.), *cert. denied sub nom. Hecht v. SEC,* 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982). The Second Circuit has stated that the relevant inquiry is "whether the scheme was being promoted primarily as an investment" or whether it was merely "a means whereby participants could pool their own activities, their money and the promoter's contribution in a meaningful way." *Id.; see Connors,* 666 F.2d at 441 (the term "solely" "has been interpreted to mean those efforts that are 'undeniably significant ...', those essential managerial efforts which affect the failure or the success of the enterprise' "). Since plaintiff has presented evidence that NIDA deferred to DMCL's management on significant decisions af-fecting the company, we cannot sustain defendants' motion on this ground.

Because material issues of fact exist with respect to 1) NIDA's and DOC's expectations of profits deriving from the Master Agreement and 2) NIDA's participation in DMCL's management, we deny defendants' motion for summary judgment on the issue of whether the Master Agreement is a security. In addition, for the reasons stated, we hold that the NIDA put is a security, and that plaintiff does not have standing to assert a cause of action arising from the sale of the DRLP partnership interests.

B. *"In Connection With the Sale or Purchase" of a Security*

Defendants assert that plaintiff has failed to prove that the alleged fraud was made "in connection with the sale or purchase" of a security, 15 U.S.C. § 78j(b); 17 C.F.R. 240.10b–5, because the allegedly fraudulent reports on the Consolidated Financial Statements were issued after all of the plaintiff's purchases had been effected. *See Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 945 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984). The Master Agreement was executed on July 28, 1978. The NIDA put option and NIDA's agreement to buy DMCL preferred stock were contained in the Master Agreement, and thus were "purchased" on that date. The DRLP interests were sold on September 22, 1978, but, as noted above, plaintiff was not a purchaser of DRLP stock and therefore may not assert a securities fraud claim arising from the sale of DRLP interests. Defendants thus claim that July 28, 1978 is the last possible date on which plaintiff's purchases took place. Plaintiff disputes that all its purchases of securities were made on that date, and claims that the "in connection with" requirement is met under three different theories, which are discussed below.

**1. NIDA's Response to "Calls"**

Plaintiff first claims that the "in connection with" requirement is satisfied because

NIDA made a separate investment decision each time it made a payment for DMCL preferred stock. These payments were made in response to "calls" by the DMCL Board as provided in the Master Agreement. Plaintiff argues that because it had "legal alternatives" to answering the calls, it made a new decision to invest each time it answered a call. The amounts of the calls paid by NIDA and the dates on which they were paid are alleged in paragraph 21 of the Complaint. The first three of eight payments antedated the issuance of AA–US's first report. The final payment was made on March 21, 1980, after AA–US's report dated March 12, 1980.

In *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir.1972), the Second Circuit held that the time of a "purchase or sale" within the meaning of Rule 10b–5 "is to be determined as the time when the parties to the transaction are committed to one another." The court went on to state:

> "Commitment" is a simple and direct way of designating the point at which, in the classical contractual sense, there was a meeting of the minds of the parties; it marks the point at which the parties obligated themselves to perform what they had agreed to perform even if the formal performance of their agreement is to be after a lapse of time.

*Id.; see Bolton v. Gramlich*, 540 F.Supp. 822, 839–40 (S.D.N.Y.1982).

 Conversely, if a party enters into a contract to buy securities in installments, but reserves power to terminate prior to full performance, then the contract does not amount to a commitment to buy the securities for Rule 10b–5 purposes. Rather, the party may be viewed as making a commitment, or "investment decision," each time the party declines to exercise his power to terminate and instead chooses to purchase a security. "Each such investment decision may be viewed as a purchase or sale of securities separate and apart from the initial agreement to undertake the

transaction." *Hill v. Equitable Bank, National Ass'n*, 599 F.Supp. 1062, 1072 (D.Del.1984). The right to make an investment decision is created by agreement among the parties to the securities transaction. *See Ingenito v. Bermec Corp.*, 376 F.Supp. 1154, 1176 (S.D.N.Y.1974).

 Defendants claim that by signing the Master Agreement plaintiff made a firm commitment to buy all 17,757,000 shares of DMCL's preferred stock on July 28, 1978, before defendants issued their reports on the Consolidated Financial Statements. In support of this argument, defendants cite paragraph 1.1 of the Master Agreement:

> On the terms and subject to the conditions as set out in [DMCL's] Articles of Association and in this Agreement, at the Closing (as defined below) [NIDA] will subscribe for and [DMCL] will issue and allot to [NIDA] an aggregate of 17,757,-000 A shares at par for cash value payable as set out below, at aggregate subscription price of £17,757,000. At the closing, [DMCL] will deliver share certificates representing such number of Class A shares, registered in the name of [NIDA] or its nominee, and [NIDA] will pay to [DMCL] £1,775,700 on account and by way of part payment for such shares. The balance of the subscription shall be paid by [NIDA] in the amounts and at the times set forth in the Corporate Plan....

We agree with defendants that by signing the Master Agreement, NIDA made a commitment to buy the DMCL stock. The portion of the Master Agreement quoted above states that NIDA *"will* subscribe for" the DMCL shares and that payment of the balance of the purchase price *"shall* be paid" by the Agency. This mandatory language is a clear expression of NIDA's commitment. This commitment is further demonstrated by paragraphs 33–37 of DMCL's Articles of Association,[10] which provide

---

**10.** As paragraph 1.1 of the Master Agreement makes clear, NIDA's obligation to subscribe for the DMCL shares was subject to the conditions set out in DMCL's Articles of Association. The relevant paragraphs in these Articles state in full:

*Forfeiture of Shares.*
33. If a member fails to pay any call or instalment of a call on the day appointed for

that if NIDA were to forfeit its right to DMCL shares by failing to meet a call, NIDA would nevertheless "remain liable to pay to [DMCL] all moneys which, at the date of forfeiture, were payable by [it] to [DMCL] in respect of the shares." Plaintiff's Exhibit 107, ¶ 37.

Plaintiff responds that as long as NIDA had "legal alternatives" to meeting the call, then NIDA was not committed to buy the shares. Plaintiff's Sur–Reply Memorandum in Opposition to Motion to Dismiss at 81. The first "legal alternative" suggested by plaintiff is that NIDA could have simply forfeited its right to the shares by refusing to answer calls. However, as paragraph 37 of DMCL's Articles of Association makes clear, NIDA would have remained liable for unsold forfeited shares. Therefore, NIDA could not have escaped its commitment in this way.

The other "legal alternative" proposed by plaintiff is rescission, which it claims would have been justified by DeLorean's alleged ongoing fraud. However, a decision to rescind is not an investment decision. *Freschi v. Grand Coal Venture,* 551 F.Supp. 1220, 1229–30 n. 9 (S.D.N.Y.1982);

*Ingenito,* 376 F.Supp. at 1176. As noted above, the right to make an investment decision can only be created by contract. *See Ingenito,* 376 F.Supp. at 1176. The right to rescind, on the other hand, is a remedy latent in any contract and cannot be regarded as a bargained-for term. The fact that NIDA paid for the DMCL stock over time rather than "up-front" is irrelevant to the determination of when the "purchase or sale" took place for purposes of section 10(b). When "a party enters into an otherwise legally binding commitment to purchase securities, the applicability of the investment decision doctrine should not turn upon how purchase payments are structured under the transaction." *Hill,* 599 F.Supp. at 1073 n. 11.[11]

## 2. Modification of the Master Agreement

Plaintiff claims that two amendments to the Master Agreement substantially modified NIDA's rights and obligations under the Master Agreement and therefore constituted new purchases under section 10(b) and Rule 10b–5. These al-

payment thereof, the directors may, at any time thereafter during such time as any part of the call or instalment remains unpaid, serve a notice on him requiring payment of so much of the call or instalment as is unpaid, together with any interest which may have accrued.

34. The notice shall name a further day (not earlier than the expiration of fourteen days from the date of service of the notice) on or before which the payment required by the notice is to be made, and shall state that in the event of non-payment at or before the time appointed the shares in respect of which the call was made will be liable to be forfeited.

35. If the requirements of any such notice as aforesaid are not complied with, any share in respect of which the notice has been given may at any time thereafter, before the payment required by the notice has been made, be forfeited by a resolution of the directors to that effect.

36. A forfeited share may be sold or otherwise disposed of on such terms and in such manner as the directors think fit, and at any time before a sale or disposition the forfeiture may be cancelled on such terms as the directors think fit.

37. A person whose shares have been forfeited shall cease to be a member in respect of the forfeited shares, but shall, notwithstanding remain liable to pay to the company all moneys which, as the date of forfeiture, were payable by him to the company in respect of the shares, but his liability shall cease if and when the company receives payment in full of all such moneys in respect of the shares.
Plaintiff's Exhibit 107.

**11.** We are not persuaded by plaintiff's attempt to analogize the deferred payment scheme of the Master Agreement to the periodic installment payments in *Goodman v. Epstein,* 582 F.2d 388 (7th Cir.1978), *cert. denied,* 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979) and *Ingenito v. Bermec Corp.,* 376 F.Supp. 1154 (S.D.N.Y.1974). In both *Goodman* and *Ingenito,* the relevant investment transactions were deliberately structured to give investors the option of cancelling their obligations to make installment payments. *Goodman,* 582 F.2d at 412–413; *Ingenito,* 376 F.Supp. at 1183. Therefore, unlike this case, each installment payment in *Goodman* and *Ingenito* involved an investment decision. *See Roth v. Bank of the Commonwealth,* [1981–1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,267 at 91,710 (W.D.N.Y.1981) [Available on WESTLAW, 1981 WL 1671].

leged new purchases occurred after defendants had certified Consolidated Financial Statements of DMC. Thus, plaintiff argues that the alleged fraud committed by defendants was "in connection with" these purchases.

"Before changes in the rights of a security holder can qualify as the 'purchase' of a new security under Section 10(b) and Rule 10b–5, there must be such significant change in the nature of the investment or in the investment risks as to amount to a new investment." *Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). The first amendment to the Master Agreement, dated December 6, 1978 ("1978 amendment"), provided for the withdrawal of NIDA's loan or loan guarantees of £7,923,000. This withdrawal was in response to the successful subscription of the DRLP partnership interests. At the outset of the venture, and as provided for in paragraph 6.3 of the Master Agreement, the parties had agreed that additional investments in the company from new investors would replace in whole or in part loan and loan guarantees from NIDA and DOC. *See* Master Agreement at 11; Plaintiff's Exhibit 1–B.

The 1978 amendment did not significantly change the nature of NIDA's and DOC's investment. NIDA and DOC remained heavily invested in the DeLorean entities and continued to have a substantial stake in the success of the venture. Far from increasing NIDA's risk, this amendment reduced NIDA's obligations to provide capital for the enterprise. Moreover, a modification, such as the 1978 amendment, that has been anticipated by the parties will generally not amount to a new purchase. *See Freschi*, 551 F.Supp. at 1229.

▮ Plaintiff relies principally on the second amendment, dated March 12, 1980 ("1980 amendment"), in arguing that a new purchase took place after defendants had issued one or more of their reports. Under paragraph 9.2 of the Master Agreement as originally executed, NIDA had the option to "put" to DMC all of its shares of DMCL stock at a price established by a pre-determined formula. If necessary, NIDA could compel DMC to sell 6,500,000 shares of its common stock to fund this buy-out of NIDA's DMCL stock.[12] Master Agreement ¶ 9.2. By the 1980 amendment to the Master Agreement, NIDA relinquished this right to realize a cash payment for its DMCL stock and instead received an option to convert its shares of DMCL stock into 7,000,000 shares of DMC's common stock. Plaintiff's Exhibit 1–C.

A material issue of fact exists as to whether the 1980 amendment represents a significant change in the Master Agreement. Under paragraph 9.2 of the Master Agreement as originally drafted, NIDA was entitled to a specific amount of money for its shares, whereas under amended paragraph 9.2 NIDA was entitled to trade its DMCL shares for a set number of DMC shares. Since the value of DMC stock could fluctuate, NIDA could conceivably have received less than it would have under the compensation formula in the original version of paragraph 9.2. It is true that even under the original paragraph 9.2, DMC's ability to pay for NIDA's DMCL stock was dependent on DMC's financial health—and ultimately upon the value of DMC's shares, since NIDA could compel DMC to sell 6,500,000 of its shares to raise capital for the put. However, under paragraph 9.2 as originally written, NIDA at least had a contractual right to a specific amount of money which it could pursue in court, for example, through attachment of DMC's assets. Under the 1980 amendment, NIDA simply had the right to exchange its DMCL stock for a fixed amount of DMC stock—whatever that stock's value.

It appears that by relinquishing its right to receive a cash payment for its shares of DMCL stock, NIDA further wedded itself to the financial fortunes of the U.S. parent company, and increased its investment risk. On the papers before us, we cannot say that change did not amount to a "signifi-

---

**12.** The number of DMC shares that could be sold to cover the purchase of NIDA's DMCL shares was adjustable according to the terms of paragraph 6.1.8 of the Master Agreement.

cant change in the nature of the investment or in the investment risks as to amount to a new investment." Accordingly, we decline to grant summary judgment on this ground.

### 3. The Alleged Unitary Scheme of Fraud

Finally, plaintiff claims that the "in connection with" requirement is satisfied because defendants' alleged malfeasance occurred in the context of an ongoing scheme of securities fraud. See Superintendent of Insurance of New York v. Bankers Life & Casualty Co., 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). The alleged scheme, which will be briefly summarized here, concerns DeLorean's alleged conversion of De-Lorean entity funds. On November 1, 1978, Mr. DeLorean executed a contract ("the GPD contract") on behalf of the De-Lorean entities with GPD Services, Inc., a Panamanian Corporation ("GPD"). Under the terms of the contract, GPD was to perform engineering work on the DMC–12 automobile in return for payments totalling $5,150,000 from DMCL and $12,500,000 from DRLP.[13] The contract stated that GPD had retained Lotus Cars Limited ("Lotus") "to assist" in the project. Plaintiff's Exhibit 15.

Plaintiff alleges that GPD was a paper corporation with no operating history and none of the patents, infrastructure, or assets that it claimed to possess. Plaintiff alleges that all of the engineering work was performed not by GPD, but by Lotus, which was paid approximately £10,555,369 directly by DMCL out of funds supplied by NIDA and DOC. Lotus apparently did not receive any of the $5,150,000 paid to GPD by DMCL pursuant to the GPD contract. Plaintiff claims that on the same day the GPD contract was executed, DeLorean caused DMC to enter into an "escrow agreement" with GPD, pursuant to which $8,500,000 of the funds paid to GPD by the DeLorean entities would by held by a Swiss lawyer. After a series of complex transactions in September 1979, Mr. DeLorean al-

legedly used these funds to pay off personal loans. The rest of the money paid to GPD by DMCL and DRLP has not been traced. Defendants are alleged to have recklessly or knowingly ignored this alleged fraud in certifying the Consolidated Financial Statements.

Plaintiff relies principally on Bankers Life, supra. In that case, the purchasers of all of the stock of the Manhattan Casualty Company paid for the stock with the proceeds of the sale of the company's own treasury bonds. Even though the corporation had received the fair market price for its bonds, the Supreme Court held that the plaintiff could bring a Rule 10b–5 action arising from the sale of the bonds, because Manhattan Casualty was defrauded by the misappropriation of the proceeds. Bankers Life thus allows a cause of action under section 10(b) when the purchase or sale of securities takes place before the consummation of a fraudulent scheme. The Court concluded that the "crux of the present case is that Manhattan suffered an injury as a result of deceptive practices touching its sales of securities as an investor." Id. 404 U.S. at 12–13, 92 S.Ct. at 169.

According to plaintiff, Bankers Life established a "de minimis 'touch test'" under which a plaintiff need not establish a direct or close relationship between the fraudulent transaction and the purchase or sale of a security, but only that the purchase or sale "touched" the defendants' fraudulent scheme in some way. However, recent decisions in the Second Circuit interpreting the Bankers Life holding have made it clear that something more than a "de minimis" relationship between the fraudulent scheme and the purchase or sale of securities is required. E.g., Pross v. Katz, 784 F.2d 455 (2d Cir.1986); Bloor v. Carro, Spanbock, Londin, Rodman & Fass, 754 F.2d 57 (2d Cir.1985); Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930 (2d Cir.) cert. denied, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); see also Manufacturers Hanover Trust Co. v. Drysdale

---

13. According to the contract, $8,500,000 of this latter amount was to be paid at the outset, and $4,000,000 in quarterly installments commenc-

ing March 31, 1979. Plaintiff's Exhibit 15. However, plaintiff alleges that the entire $12,-500,000 was paid at the outset. Complaint ¶ 31.

*Securities Corp.,* 801 F.2d 13 (2d Cir.1986), *cert. denied sub nom. Arthur Andersen & Co. v. Manufacturers Hanover Trust Co.,* —— U.S. ——, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *SEC v. Drysdale Securities Corp.,* 785 F.2d 38 (2d Cir.), *cert. denied sub nom. Essner v. SEC,* 476 U.S. 1171, 106 S.Ct. 2894, 90 L.Ed.2d 981 (1986).

 While *Bankers Life* allows a cause of action under section 10(b) where the purchase or sale of securities occurs before the completion of a scheme of fraud, no cause of action will lie unless the securities transaction "was an integral or helpful component of the fraudulent scheme." *Natowitz ex rel. Lexington/56th Associates v. Mehlman,* 567 F.Supp. 942, 947 (S.D.N.Y.1983); *see Bloor,* 754 F.2d at 61–62. Moreover, "if all of plaintiff's agreements to purchase were reached prior to any of the omissions, misrepresentations, or other deceptive practices by defendant, then the acts are not 'in connection with' the purchase or sale." *Fund of Funds Ltd. v. Arthur Andersen & Co.,* [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,765, at 93,881 (S.D.N.Y.1980) [available on WESTLAW, 1980 WL 1146]; *see Pross,* 784 F.2d at 459. Here, plaintiff has brought forth facts tending to show that some of the deceptive practices committed by DeLorean in furtherence of the alleged fraudulent scheme occurred prior to the initial sale of DMCL stock on July 28, 1978. However, plaintiff has brought forth no evidence that defendants took any actions in furtherence of the alleged scheme prior to that sale.

Plaintiff has proffered evidence that the sale of DMCL stock was integral to DeLorean's scheme to defraud NIDA and DOC. Plaintiff claims that the sale of DMCL stock was one of the main sources of funds allegedly misappropriated by DeLorean, and that therefore the fraud was "in connection with" the sale of securities. Some support for that proposition may be found in evidence that the GPD contract was signed approximately one month after the Master Agreement, and that the Escrow Fund, which DeLorean eventually depleted, was set up soon thereafter. These facts give some credence to plaintiff's allegation that DeLorean formed his scheme to defraud prior to signing the Master Agreement. *See In Re Investors Funding Corp. of New York Securities Litigation,* 566 F.Supp. 193, 197 n. 3 (S.D.N.Y.1983) (issuance of securities by corporation, followed by looting of proceeds by corporate management, satisfies in connection with requirement), *aff'd sub nom. Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57 (2d Cir.1985); Black, *The Second Circuit's Approach to the "In Connection With" Requirement of Rule 10b–5,* 53 Brooklyn L.Rev. 539, 541 (1987) (hereinafter "Black").

Nonetheless, whatever the evidence of DeLorean's scheme to defraud, it is clear that defendants played no role in the initial sale of DMCL stock on July 28, 1978 and thus are not exposed to liability under *Bankers Life* for any securities violation that occurred "in connection with" that sale. *See Pross,* 784 F.2d at 459; *Bloor,* 754 F.2d at 62; *Fund of Funds* at 93,881. It could plausibly be argued that DeLorean induced NIDA to buy DMCL stock as part of a scheme to defraud NIDA. In contrast, all of the evidence of defendants' alleged participation in this fraudulent scheme dates from after this initial purchase of DMCL securities. Defendants' first report was issued on November 20, 1978, nearly four months after NIDA's initial purchase of DMCL stock. Plaintiff has tied defendants to an alleged fraudulent scheme, but defendants' fraudulent acts within that scheme were not in connection with the initial sale of securities.

It is true that by failing to investigate and thoroughly report the GPD transaction, defendants may arguably have helped DeLorean's alleged scheme reach fruition. Accountants have a duty to take reasonable steps to correct misstatements they have discovered in previous financial statements on which they know the public is relying in making purchases or sales of securities. *Cornfeld,* 619 F.2d at 927; *Mishkin v. Peat, Marwick, Mitchell & Co.,* 658 F.Supp. 271, 273–75 (S.D.N.Y.1987); *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 549 (S.D.N.Y.1977). Nonetheless, the fact

that defendants' reports may have given NIDA a false sense of security after the purchase does not give rise to a section 10(b) claim unless defendants were in some way connected with NIDA's decision to purchase the securities in the first place. *See Abrahamson,* 568 F.2d at 868; 11A (Part 1) Gadsby, *Business Organizations,* § 5A.06; *see also Freschi,* 551 F.Supp. at 1227 (" 'Mere retention' of securities during a period of an alleged violation does not satisfy the requirement that the violation be in connection with the purchase or sale of a security." (citation omitted)); *Connors,* 666 F.Supp. at 443 (E.D.N.Y.1987).[14]

However, if it is determined at trial that the March 12, 1980 amendment to the Master Agreement was a separate purchase of securities, *see* section III(B)(2) *supra,* then defendants may conceivably be exposed to liability for inaccuracies in their reports issued prior to that date under *Bankers Life.* Under this scenario, defendants' alleged malfeasance occurred in connection with a purchase or sale of securities because defendants could arguably have foreseen that NIDA, in agreeing to the amendment, would rely on defendants' reports. *See Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.,* 801 F.2d at 20–21; Black at 540.[15]

For the reasons stated, with respect to its initial purchase of shares under the Master Agreement, we hold that plaintiff has not alleged a cause of action under section 10(b) arising from an alleged scheme to defraud. However, material issues of fact remain as to whether plaintiff was defrauded by such a scheme with respect to the March 12, 1980 amendment to the Master Agreement.

## C. *RICO*

Plaintiff alleges in its complaint that defendants violated the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. §§ 1961–1968. Defendants claim that plaintiff's RICO claims are defective on several grounds. For the reasons stated below we hold that plaintiff has stated a claim under sections 1962(a) and (c) of RICO but not under sections 1962(b) or (d).

Defendants first argue that plaintiff has not sufficiently alleged predicate acts constituting a pattern of racketeering activity. As discussed above, plaintiff has alleged that defendants issued several fraudulent reports on DMC's Consolidated Financial Statements in violation of section 10(b) of the Securities Exchange Act of 1934. This alleged violation qualifies as a "racketeering activity." 18 U.S.C. § 1961(1)(D). Defendants' use of the mails in preparing and disseminating these statements gives rise to mail fraud claims that

---

**14.** Since defendants' reports were not issued "in connection with" the initial sale of DMCL securities, the reports do not expose them to aiding and abetting liability arising from this sale. A defendant may be held liable for aiding and abetting a section 10(b) violation only if he " 'substantially assisted' in the achievement of the primary violation." *Mishkin,* 658 F.Supp. at 272 (quoting *Bloor,* 754 F.2d at 62). Defendants, at most, aided and abetted the concealment of the alleged fraudulent scheme and did not aid and abet the securities fraud component of that scheme. *Mendelsohn v. Capital Underwriters, Inc.,* 490 F.Supp. 1069, 1084–85 (N.D. Cal.1979); *see Abrahamson,* 568 F.2d at 868.

**15.** Plaintiff has thus alleged two theories of securities fraud with respect to the 1980 amendment to the Master Agreement. First, as discussed in section III(B)(2), plaintiff has alleged a straightforward "omission or misrepresentation" cause of action. This cause of action is based simply on the alleged inaccuracies of defendants' reports on the Consolidated Financial Statements. Second, as discussed in this section, plaintiff has alleged a section 10(b) cause of action based on a more comprehensive fraudulent scheme, in which defendants' reports allegedly played a role. The elements of these two theories apparently overlap in most respects. However under *Bankers Life* and its progeny, a plaintiff in a fraudulent scheme case need only show "loss causation." *Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 380–81, *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975), i.e. that defendants' alleged misrepresentations and omissions were a proximate cause of its economic loss. In a straightforward misrepresentation or omission case, plaintiff must show "transaction causation" and "loss causation" i.e., that defendant's misrepresentation or omission caused it to agree to the amendment, and that the amendment was a proximate cause of its economic loss. In a misrepresentation case, proof of transaction causation entails a showing of reliance; in an omission case, a showing of materiality. Black at 555; *see Bloor,* 754 at 61.

provide additional predicate acts. 18 U.S.C. § 1961(1)(B); *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *Connors v. Lexington Insurance Co.*, 666 F.Supp. 434, 450 (E.D.N.Y. 1987).[16] Two related predicate acts are sufficient to establish a pattern within the meaning of RICO. *Creative Bath Products, Inc. v. Connecticut General Life Insurance Co.*, 837 F.2d 561, 563–64 (2d Cir. 1988). Because the predicate acts alleged by plaintiff were all related to an alleged ongoing scheme to defraud NIDA and DOC, plaintiff has adequately pled a pattern of racketeering activity.[17] *See Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 51 (2d Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988); *United States v. Ianniello*, 808 F.2d 184, 191–93 (2d Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987).

Defendants next argue that each defendant has been cast as both an "enterprise" and a "person" in the complaint, and that a single entity may not play both roles in a RICO action. Under section 1961(4) of RICO " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). " '[P]erson' includes any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

Under section 1962(c) of RICO, a single entity "may not be simultaneously the 'enterprise' and the 'person' who conducts the affairs of the enterprise through a pattern of racketeering activity." *Bennett v. United States Trust Co. of New York*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986).[18] This section is directed at "any person employed by or associated with any enterprise" who participates in the enterprise's affairs by racketeering. 18 U.S.C. § 1962(c). "Logic alone dictates that one entity may not serve as the enterprise and the person associated with it because, as Judge Posner of the Seventh Circuit has stated, 'you cannot associate with yourself.' " *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 839 F.2d 782, 790 (D.C.Cir.1988) (quoting *McCullough v. Suter*, 757 F.2d 142, 144 (7th Cir.1985). In a section 1962(c) cause of action, the enterprise is a passive victim of the defendant person. *Bennett*, 770 F.2d at 315.[19]

However, the Second Circuit has carved out an exception to this rule when the defendant is both the person and one of a number of entities comprising a single enterprise. *Cullen v. Margiotta*, 811 F.2d 698, 723–30 (2d Cir.), *cert. denied sub nom. Nassau County Republican Committee v. Cullen*, — U.S. —, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *see also Connors*, 666 F.Supp. at 448. Here plaintiff claims that it was defrauded by defendants in concert with the DeLorean entities and persons associated with the DeLorean entities, Complaint ¶¶ 138–139. Defendants, in conjunc-

**16.** Under the mail fraud statute, each separate mailing can constitute an offense, even if there is only one scheme to defraud. *Connors*, 666 F.Supp. at 451.

**17.** On the basis of the evidence before us, we cannot say as a matter of law that plaintiff has failed to demonstrate that the alleged "enterprise" did not have continuing unlawful goals. *See Creative Bath Products*, at 563–64. Because some of the money given DMCL by NIDA and DOC has apparently never been accounted for, the GPD transaction may have been only one method used by DeLorean in his alleged scheme to defraud NIDA and DOC.

**18.** Without citing any authority, plaintiff claims that this rule does not apply to partnerships. However, cases from this district, with which we agree, hold otherwise. *See First Federal Savings & Loan Ass'n of Pittsburgh v. Oppenheim, Appel, Dixon & Co.*, 629 F.Supp. 427, 446 (S.D.N.Y.1986); *Park South Associates v. Fischbein*, 626 F.Supp. 1108, 1112 (S.D.N.Y.), *aff'd mem.*, 800 F.2d 1128 (2d Cir.1986); *Equitable Life Assurance Society of the United States v. Alexander Grant & Co.*, 627 F.Supp. 1023, 1028 (S.D.N.Y. 1985).

**19.** It follows from this reasoning that even where plaintiff has alleged an enterprise separate from the associated person, respondeat superior liability will not lie against the victimized enterprise. *See, e.g., Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1306 (7th Cir.1987); *Schofield v. First Commodity Corp.*, 793 F.2d 28, 32 (1st Cir.1986).

tion with these entities or persons, could conceivably form an "enterprise." Moreover, if defendants are separate partnerships, as they purport to be, then the three accounting firms might also form a group comprising a single enterprise. *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 21–22 (2d Cir.1983), *cert. denied sub nom., Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *In Re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 515–18 (S.D.N.Y.1987). Because there are material issues of fact concerning the existence of these enterprises, we decline to dismiss plaintiff's claim under section 1962(c).

■ Section 1962(a) does not include section 1962(c)'s requirement that the person be associated in some way with the enterprise. An emerging consensus among courts of appeals holds that the absence of such language means that the same entity can be both person and enterprise in cases brought under section 1962(a). *See Yellow Bus Lines*, at 790; D. Smith & T. Reed, *Civil RICO* ¶ 3.07[1](a) (1987) (hereinafter *Civil RICO*) (collecting cases). These courts have found that section 1962(a) applies in cases where the enterprise is the "direct or indirect beneficiary of the pattern of racketeering activity," and not when it is "merely the victim, prize, or passive instrument of racketeering." *Haroco, Inc. v. American National Bank and Trust Co. of Chicago*, 747 F.2d 384, 401–02 (7th Cir.1984), *aff'd on other grounds*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam). Therefore, to prevail on its section 1962(a) claim, plaintiff need not demonstrate the existence of an enterprise apart from the defendants.

■ Section 1962(b), the least used of the substantive RICO sections, prohibits any "person through a pattern of racketeering activity ... to acquire or maintain, directly or indirectly, any interest in or control of any enterprise." 18 U.S.C. § 1962(b). Courts are divided as to whether there can be identity between the person and enterprise under this section. *See Civil RICO* ¶ 5.03. However, we need not reach this issue, for plaintiff's allegations

do not fall within section 1962(b)'s plain language. Plaintiff has brought forth no facts tending to show that defendants purchased or maintained an interest in an enterprise—whether that enterprise be comprised of defendants, other persons associated with the DeLorean entities, or a combination thereof. *Cf. Pennsylvania v. Derry Construction Co.*, 617 F.Supp. 940, 943 (corporation might gain an interest in or control of itself through the purchase of outstanding shares of stock with the money gained from a pattern of racketeering). Accordingly, we find that plaintiff's section 1962(b) claim fails as a matter of law.

■ Defendants also argue that plaintiff has not adequately alleged 1) that defendants conspired with DeLorean to violate RICO, 18 U.S.C. § 1962(d), or 2) that defendants aided and abetted DeLorean's alleged civil RICO violations. Plaintiff has alleged no facts tending to show an agreement between DeLorean and defendants to commit RICO predicate acts. Therefore, plaintiff's conspiracy claim under 18 U.S.C. § 1962(d) is dismissed. *See Andreo v. Friedlander, Gaines, Cohen, Rosenthal, & Rosenberg*, 660 F.Supp. 1362, 1372 (D.Conn.1987); *Laterza v. American Broadcasting Co.*, 581 F.Supp. 408, 413 (S.D.N.Y.1984).

■ However, plaintiff has adequately made out an aiding and abetting cause of action. While paragraph 141 of the complaint only briefly articulates the aiding and abetting claim, it incorporates by reference the detailed allegations contained in earlier paragraphs of the complaint, and thus states the three elements of aiding and abetting liability. Plaintiff has presented evidence supporting the existence of each of these elements. First, plaintiff has alleged sufficient facts tending to show that DeLorean violated RICO. *See, e.g.*, Complaint ¶ 135; Plaintiff's Exhibits 54, 55, 56. Second, plaintiff has offered evidence that defendants knew of the alleged primary wrongdoing. *See, e.g.* Complaint ¶¶ 103, 118, 132; Plaintiff's Exhibits 18, 19, 30, 31. Finally, plaintiff has alleged facts tending to show that defendants substantially assisted DeLorean.

Complaint ¶ 132. DeLorean did not receive the misappropriated GPD funds until October 1979. Plaintiff has raised at least a colorable claim that the report on the 1978 Consolidated Financial Statements, issued in February 1979, should have more closely scrutinized the GPD loan. *See, e.g., Kranzdorf v. Green,* 582 F.Supp. 335, 337–38 (E.D.Penn.1983).

■■■ Finally, defendants assert that plaintiff's RICO claims are time-barred. The statute of limitations for RICO claims is four years. *Agency Holding Corp. v. Malley–Duff & Associates, Inc.,* — U.S. —, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The complaint in this action was filed on February 15, 1985. Plaintiff has brought forth facts tending to show that it could not have become aware of the acts giving rise to this action prior to February 15, 1981, in part because defendants' reports on the Consolidated Financial Statements omitted allegedly pertinent information about the GPD contract. Complaint ¶ 104; Plaintiff's Exhibits 24, 43. Most of the evidence offered by defendant in support of its claim that NIDA and DOC should have become aware of the fraud concerns events that occurred in late 1981, well within the limitations period. Because there is an issue of material fact with respect to plaintiff's actual or constructive knowledge of the allegedly fraudulent activities of De-Lorean and his accomplices, we deny summary judgment on the question of the RICO claims' timeliness. *See Aldrich v. McCulloch Properties, Inc.,* 627 F.2d 1036, 1042 (10th Cir.1980).

For the reasons stated, we hold that plaintiff has stated a claim under RICO sections 1962(a) and (c), but not under sections 1962(b) or (d).

## IV. FORUM NON CONVENIENS

■■■ Defendants claim that England is the appropriate forum for the trial of this action and that the "overwhelmingly European nature" of plaintiff's claims warrants dismissal of the instant case on forum non conveniens grounds. Under the doctrine of forum non conveniens, a court may dismiss an action even though it has subject matter jurisdiction when "the convenience of the parties and the ends of justice weigh heavily against the retention of jurisdiction." *Fitzgerald v. Texaco, Inc.,* 521 F.2d 448, 450 (2d Cir.1975), *cert. denied,* 423 U.S. 1052, 96 S.Ct. 781, 46 L.Ed.2d 641 (1976). A court must weigh both the private interests of the parties and the public interests of the states involved.

> The private interest factors include the location of evidence and witnesses, the availability of process to compel attendance of unwilling witnesses, as well as other practical problems that make trial of a case easy, expeditious, and inexpensive. The public interest factors include the difficulty which arises when a forum must apply foreign choice of law rules and foreign law, the administrative problems which follow when litigation is added to existing heavy caseloads in congested centers rather than being handled at its origin, and the imposition of jury duty upon a community which has no relation to the litigation.

*Transunion Corp. v. Pepsico, Inc.,* 640 F.Supp. 1211, 1215 (S.D.N.Y.1986) (quoting *Fustok v. Banque Populaire Suisse,* 546 F.Supp. 506, 509 (S.D.N.Y.1982)), *aff'd,* 811 F.2d 127 (2d Cir.1987). Normally a plaintiff's choice of forum will not be disturbed, but this presumption is less weighty where, as here, the plaintiff is foreign. *Transunion,* 640 F.2d at 1215.

### A. *Private Interest Factors*

■■■ There are documents and witnesses germane to this case on both sides of the Atlantic. However "relative ease of access to [the] sources of proof" that are crucial to this case weighs in favor of the United States. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 n. 6, 101 S.Ct. 252, 258 n. 6, 70 L.Ed.2d 419 (1981) (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 63 S.Ct. 839, 843, 91 L.Ed. 1055 (1947)).

In support of their motion to dismiss on forum non conveniens grounds, defendants reiterate their central argument marshalled against this court's exercise of subject matter jurisdiction, i.e., that only the separate reports on DMCL financial statements—

which were prepared in Ireland and the United Kingdom—give rise to a cause of action under the federal securities laws. Because most of the documentary evidence and witnesses relevant to the preparation of these reports are located abroad, defendants assert that this district is an inconvenient forum for trial of this action.

Contrary to defendants' characterization, plaintiff's case is based primarily on what AA–US did—or did not do—when provided with information by AA–Ireland, AA–UK, and various employees of DMC and DMCL. The key issues presented in this case are whether AA–US certified Consolidated Financial Statements of the DeLorean entities containing material omissions and whether employees of AA–US, AA–Ireland, and AA–UK knew about or recklessly disregarded facts which should have caused them to know about allegedly fraudulent acts perpetrated by DeLorean and others. Most of the witnesses who would testify about AA–US's supervision of the audit reside in the United States, as do most of the employees and board members of DMC and DMCL. In addition, documents used in conducting the audit of DMC's Consolidated Financial Statements are located in Detroit and New York, where the audit of the DeLorean entities was supervised. Though both sides will no doubt offer testimony of foreign witnesses pertaining to field work conducted in Ireland and the United Kingdom, the testimony of AA–US's supervisory personnel is likely to be of greater importance to plaintiff's case. Finally, because DMC's main offices were in New York City, any documents pertaining to the allegedly fraudulent acts would likely be located here.

Defendants contend that an additional private interest weighing against this court's retention of jurisdiction is that defendants may decide to assert third-party claims against officers and directors of DMCL, some or all of whom are beyond the jurisdictional reach of this court. "[T]he inability to implead other parties directly involved in the controversy is a factor which weighs against the retention of jurisdiction." *Fitzgerald*, 521 F.2d at 453. In response plaintiff points out that the only English directors of DMCL were those appointed by NIDA, and that the majority of directors are citizens of the United States and Canada. While the presence of these directors in the North America, standing alone, does not mean that they are within our jurisdiction, plaintiff argues that it is even less likely that they are within the jurisdiction of an English court.

Defendants reply that all of DMCL's directors would be subject to in personam jurisdiction in England because they transacted business there. Defendants have offered no references to English law in support of this proposition. However, even assuming that defendants have correctly characterized English law, countervailing private and public interests in this case lead us to retain jurisdiction in this court. *See Olympic Corp. v. Societe Generale, A/S*, 462 F.2d 376, 379 (2d Cir.1972).

## B. *Public Interest Factors*

The public interest factors in this case weigh in favor of retaining jurisdiction. The United Kingdom obviously has a strong interest in policing business ventures between its agencies and private interests. However, by bringing suit in this court, the British government has demonstrated its belief that this interest can be vindicated in the courts of the United States.[20] In addition, the United States has a substantial interest in preventing alleged securities frauds planned and executed in part in this country by U.S. nationals. As Judge Friendly stated in *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir.1975): "We do not think Congress intended to allow the United States to be used as a base for manufacturing fraudulent security

---

**20.** As the Supreme Court stated in *Pfizer Inc. v. India*, 434 U.S. 308, 98 S.Ct. 584, 54 L.Ed.2d 563 (1978), "[t]his Court has long recognized the rule that a foreign nation is generally entitled to prosecute any civil claim in the courts of the United States upon the same basis as a domestic corporation or individual might do. 'To deny ... this privilege would manifest a want of comity and friendly feeling.'" *Id.* at 318–19, 98 S.Ct. at 590 (quoting *The Sapphire*, 11 Wall. 164, 167, 20 L.Ed. 127 (1871)).

devices for export, even when these are peddled only to foreigners." This statement applies with added force where, as here, the securities involved are closely identified with an American corporation. *Cornfeld,* 619 F.2d at 920.

Because it is undisputed that United States law applies in this case, the difficulty of applying foreign law will not arise. *Cf. In Re Union Carbide Corp. Gas Plant Disaster,* 809 F.2d 195, 201 (2d Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 199, 98 L.Ed.2d 150 (1987); *Transunion,* 640 F.2d at 1215–16. Moreover, defendants have not shown that the "administrative difficulties flowing from court congestion," *Piper Aircraft,* 454 U.S. at 241 n. 6, 101 S.Ct. at 258 n. 6, are any less pressing in England than they are in the Southern District of New York.

Defendants claim that a central issue at trial will be the British Government's culpability in failing to discover the alleged fraudulent acts. Drawing an analogy to the "act of state" doctrine,[21] defendants argue that "trial of the issue—let alone a finding by the jury or by this Court of incompetence and recklessness on the part of Mrs. Thatcher and other members of the British government—might strain or embarrass otherwise amicable relations between the governments of the United States and Great Britain." Defendants' Reply Memorandum in Support of Motion to Dismiss at 118.

Defendants' analogy is not persuasive. NIDA's and DOC's alleged culpable acts or omissions may provide defendants with an affirmative defense. However, in passing on this affirmative defense, this court will not be required to pass judgment on the legality or validity of actions taken by a sovereign government. *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 697, 96 S.Ct. 1854, 1862, 48 L.Ed.2d 301 (1976) (plurality opinion) (citing *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427–28, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964)). We will not be reviewing the British government's authority to take the actions it did, but merely whether these actions defeat some or all of its claims against defendants. Moreover, there is no danger that our consideration of this affirmative defense will "embarrass the Executive Branch of our Government in the conduct of our foreign relations." *Id.; see West v. Multibanco Comermex, S.A.,* 807 F.2d 820, 827 (9th Cir.1987).

Finally, defendants argue that dismissal is appropriate because the British government has filed writs against defendants in the courts of Britain and Northern Ireland based on the same transactions that gave rise to this suit. Plaintiff asserts that it filed these writs as a defensive measure, to toll the statute of limitations in the United Kingdom in case this court dismisses the instant action on procedural grounds. Plaintiff has expressed its desire to proceed with the British actions only through the preliminary stages of litigation. July 31, 1985 Affidavit of John Wright, ¶¶ 5–6; Plaintiff's Ex. 143. Because many of the issues raised in defendants' motion to dismiss were close ones, we think plaintiff's actions in England were no more than prudent. However, because a "litigant is entitled to his day in one court, but not in two," *Rosenfeld v. Black,* 445 F.2d 1337, 1341 n. 5 (2d Cir.1971) (Friendly, J.), we will allow defendants to renew this portion of their motion if it appears at any stage of the proceedings that plaintiff is in fact prosecuting duplicative lawsuits in two jurisdictions.[22]

---

**21.** Under the act of state doctrine, a U.S. Court cannot entertain any action that calls into question the validity or legality of conduct or policies of a foreign government acting within its sovereignty. *See Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427–28, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1964). "The degree of foreign government entanglement which must be present to invoke the act of state doctrine varies with the circumstances of individual cases." *Zenith Radio Corp. v. Matsushita Elec-*

tric Industrial Co., 513 F.Supp. 1100, 1194 n. 123 (E.D.Penn.1981), *aff'd in part, rev'd in part sub nom. In Re Japanese Electronic Products Antitrust Litigation,* 723 F.2d 238 (3d Cir.1983), *rev'd on other grounds,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

**22.** Because the actions brought by plaintiff in the United Kingdom were a mere three weeks old when plaintiff filed the instant action, and were apparently filed for defensive reasons

For the reasons stated, defendants' motion to dismiss on forum non conveniens grounds is denied.[23]

## V. CONCLUSION

Defendants' motion is denied in part and granted in part. We hold as follows: 1) We have jurisdiction over the parties and the subject matter of this suit; 2) Plaintiff has demonstrated the existence of issues of material fact concerning whether plaintiff's predecessor in interest was defrauded by defendants "in connection with" a purchase or sale of stock arising from the March 12, 1980 amendment to the Master Agreement; 3) As a matter of law, plaintiff has not alleged a cause of action arising from its initial purchase of shares pursuant to the Master Agreement; 4) Plaintiff has alleged sufficient facts to avoid dismissal of its civil RICO claims brought pursuant to 18 U.S.C. §§ 1962(a) and (c); 5) Plaintiff has not alleged a cause of action under 18 U.S.C. §§ 1962(b) or (d); and 6) The Southern District of New York is not an inconvenient forum for trial of this action.

SO ORDERED.

## ORDER

### ON MOTION TO CERTIFY FOR INTERLOCUTORY APPEAL

Defendants have requested by letter dated March 15, 1988 that we certify our March 8, 1988 Memorandum Decision ("the Decision"), familiarity with which is assumed, for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Plaintiff has submitted a letter in opposition.

Under section 1292(b), "[w]hen a district judge, [issues] an order not otherwise appealable, [and is] of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation," he or she may certify the Order for interlocutory appeal. "The procedure set forth in Section 1292(b) should be used sparingly and only in exceptional cases." *Samuel M. Feinberg Testamentary Trust v. Carter,* 652 F.Supp. 1066, 1084 (S.D.N.Y. 1987) (quoting *Inmates of Unit 14 v. Rebideau,* 102 F.R.D. 122, 129 (N.D.N.Y.1984)); *see Abortion Rights Mobilization, Inc. v. Regan,* 552 F.Supp. 364, 366 (S.D.N.Y. 1982).

A "controlling question of law" under section 1292(b) is one that could terminate the action, and additionally "may contribute to the determination, at an early stage, of a wide spectrum of cases." *Herold v. Braun,* 671 F.Supp. 936, 938 (E.D. N.Y.1987) (quoting *Kohn v. Royall, Koegel & Wells,* 59 F.R.D. 515, 525 (S.D.N.Y.), *appeal dismissed,* 496 F.2d 1094 (2d Cir. 1974)); *see Brown v. Bullock,* 294 F.2d 415, 417 (2d Cir.1961) (en banc). Here, the issue of subject matter jurisdiction is the sole issue determined in the Decision that is arguably "controlling." For the reasons stated below, we do not think that it is the kind of question appropriate for interlocutory appeal.

The question of subject matter jurisdiction in this case does not involve a disagreement with respect to the applicable law. Rather, the question turns on an analysis of the relevant facts. As noted in the Decision, the Second Circuit has formulated a broadly-worded standard for determining when domestic conduct that is alleged to have assisted in the perpetration of a securities fraud on investors outside this country will activate federal jurisdiction. We applied this standard in determining that plaintiff had brought forth sufficient facts to defeat defendants' motion to

---

only, we decline to follow the "first filed rule" and stay this action pending the resolution of the overseas suits. *See Columbia Pictures Industries, Inc. v. Schneider,* 435 F.Supp. 742, 746–47 (S.D.N.Y.1977), *aff'd mem.,* 573 F.2d 1288 (2d Cir.1978).

**23.** Plaintiff suggests that defendant should be sanctioned for advancing frivolous arguments and stonwalling discovery. We think that the submissions of defendants and defendants' counsel are sufficiently grounded in fact and law. In addition, we are not persuaded that defendants' actions were taken in bad faith. Fed.R.Civ.P. 11. However, in the future both sides should avoid the invective that marred their motion papers.

dismiss. Section 1292(b) is not a vehicle "for securing early resolution of disputes concerning whether the trial court properly applied the law to the facts." *Abortion Rights Mobilization*, 552 F.Supp. at 366. Because the issue is so fact-dependant, we do not think that an interlocutory decision by the Court of Appeals will assist in the early disposition of "a wide spectrum of cases." *See DeWitt v. American Stock Transfer Co.*, 440 F.Supp. 1084, 1088 (S.D. N.Y.1977).

Moreover, further discovery may turn up new facts relevant to the issue of subject matter jurisdiction, and these facts may in turn influence this Court's interpretation of facts already proffered by the parties. For example, the relative significance of defendants' domestic and foreign acts is crucial to this Court's exercise of subject matter jurisdiction. The Second Circuit has stated that "live testimony and detailed evidence" at trial are the best methods for determining the materiality of such acts where subject matter jurisdiction under the securities laws is disputed. *Fidenas AG v. Compagnie Internationale Pour l'Informatique CII Honeywell Bull S.A.*, 606 F.2d 5, 6–7 n. 2 (2d Cir.1979) (quoting *Venture Fund (International) N.V. v. Willkie Farr & Gallagher*, 418 F.Supp. 550, 555 (S.D.N.Y.1976)). Determining the relative weight to give specific evidence is part of the fact-finding job to be performed at *nisi prius*, and a task ill-suited for an appeals court on an interlocutory appeal. 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure § 3930 at 160–161 (1977); *see International Society for Krishna Consciousness, Inc. v. Air Canada*, 727 F.2d 253, 255–56 (2d Cir.1984).

Accordingly, we decline to certify our March 8, 1988 Memorandum Decision for interlocutory appeal.

SO ORDERED.