**David W. ALLARD, Jr., Trustee of DeLorean Motor Company, Plaintiff,**

v.

**ARTHUR ANDERSEN & CO. (U.S.A.), Arthur Andersen & Co. (Republic of Ireland), and Arthur Andersen & Co., Defendants.**

**DEPARTMENT OF ECONOMIC DEVELOPMENT, Plaintiff,**

v.

**ARTHUR ANDERSEN & CO. (U.S.A.), Arthur Andersen & Co. (Republic of Ireland), Arthur Andersen (United Kingdom), Richard E. Beckman, Richard L. Measelle, and Edward A. Massura, Defendants–Third–Party Plaintiffs,**

v.

**Alex H. FETHERSTON, C. Shaun Harte, Ronald J. Henderson, Anthony S. Hopkins and James Sim, Third–Party Defendants.**

Nos. 84 Civ. 7703 (MBM). 85 Civ. 1292 (MBM).

United States District Court, S.D. New York.

Feb. 11, 1997.

Robert F. Brodegaard, Robert Sidorsky, and Joan A. Lieberman, Thacher Proffitt & Wood, New York City, for Plaintiff Department of Economic Development.

Zachary Shimer, Michael D. Hess, and Timothy M. Hughes, New York City, Chadbourne & Parke, for Plaintiff Allard.

James D. Zirin, James J. Sabella, Brenda F. Szydlo, Madeleine J. Dowling, and Stephanie L. Pearson, Brown & Wood, New York City, for Defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

This opinion treats defendants' renewed motion in these related cases for a summary judgment, following a hearing pursuant to Federal Rule of Civil Procedure 43(e)[1] on

1. That Rule reads in pertinent part as follows: "(e) Evidence on Motions. When a motion is

based on facts not appearing of record the court

the issue of whether or not one of plaintiff Department of Economic Development's ("DED") predecessors in interest, the Northern Ireland Development Agency ("NIDA"), made a new investment decision for federal securities law purposes when it agreed on March 12, 1980 to revise the terms of a put it held with respect to preference shares of DeLorean Motor Corporation, Ltd. ("DMCL"), DeLorean Motor Corporation's ("DMC") manufacturing subsidiary in Northern Ireland. If NIDA did make a new investment decision at that time, then DED's securities law claim, the only remaining federal claim in this case, stands; if it did not, then that claim must be dismissed.

The March 12, 1980 revision eliminated NIDA's right to a cash payment after ten years, a payment which, at the time of the revision, was highly unlikely to occur. As explained in Section II below, the elimination of such an unlikely possibility did not constitute "such significant change in the nature of the investment or in the investment risks as to amount to a new investment." *Abrahamson v. Fleschner,* 568 F.2d 862, 868 (2d Cir. 1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978). Therefore, the put revision did not cause NIDA to make a purchase or sale of a security within the meaning of the Securities Exchange Act of 1934, and defendants' motion to dismiss the claim arising from the put revision is granted.

Further, and for the reasons set forth in Section III below, there being no surviving federal claim in either of these cases, the state claims in both are dismissed without prejudice.

## I.

In separate opinions in these cases filed on April 2, 1996, I granted in part and denied in part the motions of defendants Arthur Andersen & Co. and three of its partners for a

summary judgment dismissing the claims against them. *Department of Econ. Dev. v. Arthur Andersen & Co.,* 924 F.Supp. 449 (S.D.N.Y.1996); *Allard v. Arthur Andersen & Co.,* 924 F.Supp. 488 (S.D.N.Y.1996). Familiarity with those opinions and the rulings therein is assumed for current purposes, and only so much of the background as is necessary to decide the issue currently before the court will be set forth below. As a result of those rulings, DED's only remaining federal claim is for securities fraud arising from any of four transactions: the September 1978 amendment to the Master Agreement between DED's predecessors, NIDA and the Department of Commerce ("DOC") on the one hand, and various DeLorean entities on the other; the April 12 and October 22, 1979 amendments to the grant letter of assistance from DOC; and the March 12, 1980 modification of a put held by NIDA which, before the revision, permitted NIDA to compel DMC to repurchase on specified terms the DMCL preference stock that NIDA held. *Department of Econ. Dev.,* 924 F.Supp. at 478–79.

If none of those transactions effected such a significant change in the investment risks faced by DED's predecessors as to amount to a new investment, then even if Andersen is hypothesized to have made false statements in connection with those transactions, with the requisite intent, such transactions could not be regarded as purchases or sales of securities and therefore such statements could not provide the basis for a claim under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder. *Abrahamson, supra.*

### A. The NIDA Put and Its History

Of the four transactions referred to, DED relies now only on the March 12, 1980 revision of the NIDA put as having changed significantly the investment risks NIDA faced.[2] How that transaction came about is

---

may ... direct that the matter be heard wholly or partly on oral testimony or deposition."

**2.** In 1988, Judge Stewart granted summary judgment dismissing the securities claim arising from the September 1978 amendment to the Master Agreement. *Department of Econ. Dev. v. Arthur Andersen & Co.,* 683 F.Supp. 1463, 1476–77

(S.D.N.Y.1988); see *infra* at 416–17. DED may continue to press that claim on appeal, but has advised that it offers no new evidence or arguments now. In addition, at a conference on January 27, 1997, DED advised the court that it does not continue to press any federal claim arising from the April 12 and October 22, 1979 amendments to the grant letter of assistance

set forth below, but any discussion of the NIDA put or any other aspect of the British government's investment in the DeLorean venture would be incomplete without mention that from the British government's standpoint, the DeLorean investment was not simply or even principally a commercial transaction. The management consulting firm of McKinsey & Co., which was retained by DOC to assess the DeLorean investment, found that the project was "very risky" (DX 2 [3] at 1), that it was "extraordinarily risky" (*id.* at 8), and that "the chances of the project succeeding as planned are remote" (*id.* at 9). The first page of DMC's 1979 prospectus painted a stark picture of the commercial features of the transaction:

> No United States company (except established motor companies) has successfully accomplished the manufacture and sale of a new automobile in at least twenty-five (25) years and as far as the Company is aware, no company has sold an automobile priced in excess of $12,000 at a volume of 20,000 or more units per year. It is anticipated that the sales price of the Company's car will be higher than $12,000 and its initial sales goal is 20,000 units per year.

(DX 11 at 317006) Rather, as reflected in documents quoted in the earlier opinion reported at 924 F.Supp. 449, the British government had a political agenda. That government invested £17,757,000 in what it knew to be a high-risk project in order to try to improve employment in West Belfast, where the DMCL plant was located, and thereby counter the IRA's efforts to foment disorder. 924 F.Supp. at 459–60; *see also* DX 3 at 1 (the Secretary of State for Northern Ireland viewing the project as a chance to strike "a hammer blow to the IRA"); DX 47 (Secretary of State Atkins concluding in December 1981 that, "it would be disastrous, both politically and commercially, to pull the plug out on the company at this stage"); DX 46, Annex A ¶¶ 12–13 (outlining political effects of closing the Northern Ireland plant).

Under the Master Agreement dated July 28, 1978, NIDA agreed, *inter alia*, to purchase from DMC all of the 17,757,000 preference shares of DMCL, at a price of £1 per share. (DX 4 ¶ 1.1) DMC also issued a put to NIDA. Under the terms of the put, between four and ten years from the date NIDA paid for the preference shares (the "Subscription Date"), NIDA could force DMC to buy NIDA's DMCL preference shares for the cash value of 6.5 million shares of DMC stock. After ten years, NIDA could force DMC to repurchase the DMCL preference shares for £1 per share plus a premium of 10p per year for each year after the third year following the Subscription Date less royalties previously paid on automobile sales. DMC was required to offer for sale 6.5 million shares of its common stock "to the extent necessary" to finance the exercise of the put. (DX 4 ¶ 9.2) In March 1980, NIDA estimated that it would receive $50 million for the DMCL preference shares when it exercised the put in the tenth year. (*E.g.,* DX 35 at 2)

The documentary evidence reflects that the NIDA put came into being as an accommodation when the British government's desire to invest directly in DMC, a U.S. company, proved impossible to realize due to then existing U.K. exchange control restrictions. Instead, the Northern Ireland subsidiary, DMCL, was created, and NIDA took preference shares in that entity. Moreover, the same exchange control restrictions made it problematic to provide for conversion of the DMCL preference shares into DMC common shares at a later date because that step would have required Bank of England approval at the time of the conversion. (DX 50 at 27, 33; DX 29 at 2; DX 52 at 35)

However, DMC also retained a call on the preference shares during the first four years after the Subscription Date, at £1 per share plus 15p per share for each year to the date of exercise, less royalties paid on automobile sales. Again, the call was to be financed, if

---

from DOC, although it may continue to assert state law claims arising from those transactions.

**3.** Documents are referred to herein using the exhibit designations they were given in connection with the Rule 43(e) hearing, rather than the designations used in connection with the summary judgment motions decided in April 1996. Defendants' exhibits are designated "DX", plaintiff's exhibits "PX".

necessary, from the sale of up to 6.5 million shares of DMC common stock. (DX 4 ¶ 9.4)

In March 1980, the parties renegotiated the NIDA put. Under the new arrangement, after four years, NIDA would have the right to convert its DMCL preference shares into 7 million shares of DMC common stock.[4] However, NIDA surrendered the right to compel DMC to buy the DMCL preference shares for cash after ten years. This revision did not affect DMC's right to call the preference shares during the first four years.

This renegotiation resulted from the Securities and Exchange Commission's July 1979 ruling that changed the accounting treatment of the NIDA put on DMC's books. That ruling, called Accounting Securities Release 268 ("Release 268"), required that DMC carry its redemption obligation under the NIDA put in the tenth year following the Subscription Date, as debt rather than as equity on its balance sheet. (DX 13)

As of November 30, 1979, DMC's consolidated balance sheet showed stockholders' equity of $20,924,602. (DX 21 at 3) The effect of the accounting change and the insertion of a new long-term liability on DMC's consolidated balance sheet would have been to convert that into a deficit of about $8 million (DX 36 at 1), with the result that DMC would have encountered added difficulty raising additional capital or obtaining short-term credit from suppliers.[5] (DX 28 at 1)

Various proposals were put forward, including one from Robin Bailie, DMCL's solicitor, that NIDA give up the cash redemption feature after ten years and instead take an option to convert its preference shares after ten years into 6.5 million shares of DMC common stock. Anthony Hopkins, one of NIDA's nominee directors on the DMCL

board, wrote "No" in the margin next to that proposal (DX 24 at 2), and wrote in a memorandum dated January 22, 1980, as follows:

> You will see from Mr. Bailie's letter that he has suggested a clause which the Company has asked him to put to us to supercede [*sic*] our rights to sell the shares both in the 4–10 year period and after 10 years. I have told Mr. Bailie that I have no intention of renegotiating the 4 year + option which is in the Agency's favour (I also told him that I was most surprised that the Company should even venture to suggest such an idea). We will consider a trade off from the 10 year + option which allows us redemption in cash on a par plus 10% per annum cumulative basis, minus 50% royalties in exchange for a conversion right into common stock if equal. The basis of that arrangement would have to be that the conversion would give us a total value of common stock equivalent to the value obtainable under present arrangements. In other words, we cannot commit, (at this stage) to an agreement to convert into a fixed number of units of common stock which might be worth little.

(DX 25)

However, Hopkins also wrote in the same memorandum: "The 10 year + option [for NIDA to put its DMCL preference shares to DMC for cash] is very much a fall back position anyway since (a) DMC are very likely to take us out on their option * **or (b) we will exercise our option** between years 4 and 10." The words in bold appear in the margin next to an asterisk corresponding to the asterisk inserted at that point in the main text, and were plainly meant to be inserted at that point. The reference to DMC taking NIDA out refers to DMC exercising its call

---

4. The right to convert the DMCL preference shares directly into DMC shares, rather than to compel DMC to sell a specified number of shares which would then be used to buy the DMCL preference shares, as had been provided for in the Master Agreement (*see supra* at 412), was made possible by elimination of the exchange control restrictions that earlier had clouded NIDA's right to own DMC stock. The distinction between such direct ownership of DMC common stock, and the purchase of the DMCL preference shares from the proceeds of the sale of DMC

common stock, is immaterial here because DMC shares were publicly traded. DED does not argue otherwise.

5. DED's expert, John D. Finnerty, testified that the effect would have been to change DMC's shareholders' equity from positive $20.9 million to negative between $5 and $6 million (Tr. 17–18), but he agreed that "it was feared that that would have or could have a significant effect on DeLorean Motors' ability to arrange trade credit." (Tr. 18)

rights in the first four years should the project prove successful and the value of DMC stock rise as a result.

As noted, the amendment that was eventually agreed to gave NIDA the right to convert its DMCL preference stock any time after four years from the Subscription Date into 7 million shares of DMC stock, and retained the call feature that permitted DMC to purchase the DMCL preference stock at a specified price before the four-year mark was reached. During the discussions that led to that amendment, NIDA had the benefit of the advice of outside counsel and bankers, personnel affiliated with it and with DOC, and, although Andersen seems to dispute the legal consequences, of Andersen as well. Thus NIDA's Hopkins expressed to Frank McCann of DOC on February 7, 1980 his view,

> subject to obtaining legal advice ... that agreement to the proposed amendment would not diminish the value of our holding now or in the future. Subject to the approval of all the other parties to the original agreement, we would accede to the request that is before us.

(DX 26 at 1) McCann, in turn, sent a memorandum a week later, on February 14, 1980, to representatives of the British government expressing the same view. He first described the effect of Release 268: "The effect of this re-classification on the balance sheet would seriously reduce the strength of the DMC balance sheet and most certainly have an adverse effect both upon the company's ability to raise further capital and to negotiate optimum credit terms with major suppliers." He then described the effect of the proposed change, and suggested why he thought it would not diminish the value of NIDA's holding:

> DMC has proposed that the Agreement should be altered so that NIDA may not require DMC (or DMCL) to purchase the Agency's holding but instead require that its shares be converted into DMC common stock. Subject to independent legal advice ... it seems clear that the proposed amendment will not diminish the value of NIDA's holding or their ability to sell it

off, if DMC is successful (which was admittedly a pre-condition to their ability to exercise the original option).

(DX 28 at 1)

The lawyers described the proposed change to NIDA and its solicitors as "not a variation of substance" and "cosmetic." (DX 29 ¶¶ 2, 5) The bankers, speaking through Leo Conway of the Ulster Investment Bank Ltd., saw the amendment as tipping, if at all, in NIDA's favor, a conclusion they reached after a two-step analysis, examining the impact first of Release 268 absent any amendment to the NIDA put, and then of the proposed amendment. Notably, Conway saw the proposed amendment as a benefit to NIDA apart from its benign effect in avoiding the rigors of Release 268, although he certainly considered that effect as well. Absent the proposed modification, he wrote, the effect of Release 268 would have been to "call into question the solvency of the companies." He suggested two possible effects of the release from NIDA's standpoint: (i) the possible tightening of credit from suppliers could lead to an increase in the company's working capital requirements with the demand falling upon NIDA or other government agencies to supply those requirements; and (ii) more broadly, "the prospects of ultimate success in the project could be harmed if publicity was given to the weakness of DMC's balance sheet, with a resulting loss of credibility in the marketplace." (DX 37 at 1–2) He then turned to the effect of the modification:

> Against the prospect of a greater financial return, the company has surrendered the prospect of direct access to a cash payment by DMC, but it must be recognized that, if the project is not successful, it would be doubtful if DMC would be in a position to meet that obligation. Accordingly, we feel that the balance of advantage arising from the changes is at least neutral and could be considered, in practical terms, to operate slightly to the Agency's advantage. *This is without taking account of the avoidance of the problems which would potentially arise if the Master Agreement was not varied, and in particular the possible call*

*for further financial support to make good the effects of tighter supplier credit terms.*

(*Id.* at 3) (emphasis added)

On March 5, 1980, a week before the transaction was consummated, NIDA's Hopkins and G. Toland of Lovell, White and King, one of the law firms advising NIDA, summarized the advantages and disadvantages of the proposed transaction, and presented their view:

(1) NIDA Loses:

(A) The cash put—the value of this depends on the ability of DMC to provide funds to satisfy it. Which in essence depends upon the success of the business. The late [*sic*] [latter] will be reflected in the market value of the DMC shares owned by us (upon exercise of option) under proposed solution.

(B) Fixed price redemption after 10 years—the value of this could be around · dolls 50 million (D35M par plus 7 years at 10 per cent P.S. day D 25M minus one half of pounds 45 per car royalty say ·D 10M).

(2) NIDA Gains:

(A) 500,000 more DMC shares:

(B) Option related to market value indefinitely rather than limited to 4/10 year period. If 7 million DMC common stock achieve market price of more than dolls 7 per share this will show a better return than fixed price redemption (we do not deduct royalty income from market value). Shares have been sold to dealers at dolls 10 per share.

(3) NIDA/DMC Gain:

Resolution of potential supplier credit problem in simple manner within necessary timeframe avoiding likely if unquantifiable requirement for NIDA to guarantee credit shortfall.

(4) Hopkins recommends that proposal be put, subject to professional advice from Leo Conway, to NIDA Board for approval.

(GX 35 at 2) With respect to the "potential supplier credit problem" that would be resolved by the amendment, the authors acknowledged in the same document the likely adverse impact on DMC's trade credit from Release 268. (*Id.* at 1)

Hopkins recognized the same thing, and analyzed the effect of the amendment, in a report completed the day before the NIDA put was amended, when he summarized in three terse paragraphs the considerations facing the NIDA board:

In essence, NIDA is exchanging a right to obtain cash equivalent to 6.5 million shares in DMC from the Company for a right to convert into 7.0 million DMC shares which we would then sell in the market. The 'value' of the present cash obligation depends on the success of the Company in any case and this will be reflected in the market price of our shares.

We also exchange a fixed price return in 10 years time for a market value extending indefinitely. If the Company is reasonably successful, this will leave us in a stronger position; if not, we will not be any worse off.

The revised agreement would also resolve the potential supplier-credit problem which will exist if the DMC group has to pay cash for supplies. This potential problem cannot be quantified without prejudicing the supplier relationship, but it is potentially very serious.

(DX 36 at 2)

Hopkins' deposition testimony after this lawsuit was filed was substantially different from what he and others at NIDA and DOC were saying and hearing as events unfolded. In particular, his testimony takes no account of the interdependence of DMC's fortunes and its ability to pay the strike price of the NIDA put, or of the likelihood that if DMC had the money to pay that price, the DMC stock that NIDA would receive instead would be worth at least that price if not more. Thus, rather than reflecting the acute recognition of that interdependence that he, McCann, their banking consultant Conway and their attorney, Toland, had displayed at the time events were unfolding (*see supra* at 414–15), Hopkins' deposition testimony, much relied on by DED, was in part as follows:

It was inherent, I believe, in what I said before, that I believed there was potential for us to be worse off if we accepted that

change. We were changing from a certain cash payment to a less certain transfer into stock, which we would have to sell in the market.

We had to make a commercial judgment about what we were giving away, what we were receiving instead. In fact, in the discussions with the Merchant Bank, the advice we were getting is that we needed to secure something else in the upside because in itself, in isolation, giving up a cash put could actually affect us, damage us, leave us in a worse position.

On balance, we came to the conclusion that this was a reasonable tradeoff. In putting the proposition to the board, I may have been paraphrasing somewhat to say—because, I mean I was making a recommendation to the board, having taken a lot of time reviewing it, but we should do it. We had a discussion at the board meeting on the basis of this paper when it was recognized that in certain circumstances we could lose, and in other circumstances we could gain slightly more, but it was a tradeoff.

(PX 49 at 836–37)

DED's remaining Rule 10b–5 claim relates to audited DMC financial statements that Andersen issued at the time of the amendment to the NIDA put. Andersen did not issue those statements until March 12, 1980, the date the transaction took place, and therefore it is difficult to argue that NIDA relied on those financial statements in reaching its decision to enter into that transaction. However, there is evidence from which a jury could find that Andersen did communicate to NIDA before March 12 the substance of its conclusions in the financial statements, and that the message that Andersen conveyed and that NIDA heard was that DMC had received essentially a clean bill of health considering that it was a start-up venture. Thus, on February 6, 1980, Andersen submitted to DMC's audit committee, which included directors nominated by NIDA, that Andersen's audit report would contain the same qualification it had the year before, and that it would not question the costs incurred to acquire DMC's assets. (Sidorsky Aff., Ex. 9 at 1) That report was discussed at a February 10 meeting of that committee. One of those directors, third-party defendant Alex H. Fetherston, reported to Hopkins of NIDA that the audit committee had gone through Andersen's report "Clause by Clause" and that Andersen did not anticipate any further communication with the audit committee about the status of the audit. (Sidorsky Aff., Ex. 10 at 4)

Fetherston reported separately to NIDA that at a joint meeting of the DMC and DMCL boards of directors on February 11, 1980, T.J. Daly, DMCL's Director of Finance, had "stressed that Arthur Andersen, the auditors, had given the Company a clean bill of health with no reservations." (DX 27 at 3) To be sure, Daly was not associated with Andersen, but his impression of what Andersen was saying appears consistent with Fetherston's. It is consistent also with a report by defendant Richard L. Measelle, an Andersen partner, about the February 10 meeting of DMC's audit committee. That report makes plain that Andersen's only proposed qualifications to DMC's financial statements were those one would expect to find in a start-up company, and that although Andersen would not say that in so many words, the standard language of the qualification itself would convey that message:

Featherstone [*sic*] wanted us to say in our subject to qualification 'as is normal in the circumstances' with respect to our Subject to. He pointed out that in the U.K., people 'get nervous about this type of thing.' I explained that this was standard wording here in the United States and, indeed, these were words of art and that I would prefer to leave the opinion as drafted.

(DX 31 at 1)

B. *Procedural History*

In a 1988 opinion, the late Judge Charles E. Stewart, who presided over these cases before they were reassigned to my docket in early 1994, denied Andersen's motion addressed to the claims in the original complaint, including the claim based on the March 12, 1980 amendment to the NIDA put. *Department of Econ. Dev.*, 683 F.Supp. 1463. The motion was filed initially as a dismissal motion pursuant to Fed.R.Civ.P. 12(b), but

was converted into a summary judgment motion after both sides submitted material outside the pleadings for the Court's consideration. The holding was simply that, "On the papers before us, we cannot say that change [in the NIDA put, relinquishing the right to a cash payout after ten years and taking additional DMC stock instead,] did not amount to a 'significant change in the nature of the investment or in the investment risks as to amount to a new investment.'" 683 F.Supp. at 1477–78 (quoting *Abrahamson, supra*). The opinion refers to motion papers dated as early as July 1985, *e.g.*, 683 F.Supp. at 1485, and it seems reasonable to conclude that notwithstanding the parties' resort to submissions outside the pleadings, the issues in the case had not been fully developed through discovery or otherwise by the time the motion was briefed.

In April 1996, I decided the motions referred to at the beginning of this opinion. In the opinion reported at 924 F.Supp. 449, I again denied summary judgment and stated that Andersen had relied on the same evidence put before Judge Stewart. *Department of Econ. Dev.*, 924 F.Supp. at 478. As Andersen points out, that was incorrect. The NIDA board minutes and internal memoranda had not yet been produced when the motion was presented to Judge Stewart. *See* Defendants' Mem. on the Rule 43(e) Hearing and In Support of Dismissal at 31 n. 36. Moreover, the issues relating to the NIDA put were not addressed in the earlier motion before me with the same focus and clarity brought to bear now. In any event, to the extent DED would rely on the earlier decisions herein to forestall judgment now, the law of the case doctrine sets a prudential and discretionary rule, not a mandatory one. *Lewis v. Whelan*, 99 F.3d 542, 545 (2d Cir. 1996); *Higgins v. California Prune & Apricot Grower, Inc.*, 3 F.2d 896, 898 (2d Cir. 1924) (L. Hand, J.).

C. *The Rule 43(e) Hearing and DED's Post–Hearing Submissions*

■ The Rule 43(e) hearing took place on October 28 and 29, 1996. Although both sides proffered documents in connection with the hearing, and DED presented an electronically recorded video segment of Hopkins' deposition testimony that included the testimony quoted above, the only live witness was John D. Finnerty, called by DED, an expert in and teacher of finance who is also in the business of providing litigation support.

On his direct testimony, Finnerty presented a series of scenarios depicted in charts reflecting varying enterprise values, to show that if the DeLorean venture survived to the tenth year after the Subscription Date, the risk that DED's predecessors in interest would not recover their investment increased significantly as the result of the amendment to the NIDA put. His scenario for conditions before amendment of the put was determined as follows: He calculated that if the enterprise value of DMC increased above the $66.8 million that would have been necessary to pay off the projected debt level after all necessary financing had been raised, the amount of that increase would have been available dollar for dollar to pay the NIDA put, up to a total enterprise value of $116.8 million—$66.8 million to pay off the debt plus $50 million to pay the maximum estimated value of the put at year ten. (Tr. 35–36)

He then compared the return to NIDA before amending the put with the return after, at varying levels of enterprise value and leverage after 10 years, and concluded, for example, that at 40% leverage (ratio of debt to equity), NIDA would do better before the amendment than after at values between $27 million and about $125 million (Tr. 37–38); at 60% leverage NIDA would do better before the amendment than after at enterprise levels between $66.8 million and about $260 million. (Tr. 39) The net result of his analysis was: "if the venture is moderately successful, NIDA does better before the amendment. If the venture is highly successful, NIDA was better afterwards." (Tr. 41)

Finnerty also testified, and presented charts purporting to show, that the amendment "weighs the likelihood towards the bad outcomes." (Tr. 41) He testified that the effect of the amendment was to increase the dispersion of outcomes of NIDA's investment, and therefore the risk. (Tr. 46–47) He testified also that the likelihood of NIDA

not recovering $50 million, the estimated value of the put, was 55% before the amendment and 85% after. (Tr. 47)

However, the analysis Finnerty presented in his report and on direct examination was deeply flawed. To begin with, although Finnerty referred to Release 268 in his report (PX 45 at 6–7), he seemed to perceive in that Release only what he thought supported the position he was advocating, and nothing else. Thus, he wrote that by making it necessary to treat the convertible stock on DMC's books as debt instead of equity, the Release caused concern about DMC's ability to arrange trade credit from suppliers or to obtain debt financing from other sources, and that, in turn, led the parties to look for an alternative that would permit the stock to be treated as equity. However, he did not discuss in his report or in his testimony the effect that DMC's inability to arrange trade credit or alternative financing would have on NIDA's chances of ever seeing $50 million after 10 years. Instead, he simply boiled the question of whether there was a substantial change in NIDA's investment at the time the put was amended, down to a question of whether there was a difference in the abstract between receiving cash after ten years and receiving DMC stock after ten years. In so doing, he boiled off a great deal that was important. The effect of Release 268 was to propel what was already a high-risk venture even closer to the precipice. Therefore, the correct comparison was not between what existed before Release 268 and the amendment, but rather between what existed after Release 268 and the amendment. That comparison Finnerty never made.

Indeed, he appears not to have considered the risks actually faced by the parties here at all, except in the desiccated sense in which he testified to risk as an array of possibilities in various abstract enterprise value scenarios. That failure was made explicit on cross-examination:

Q. Wouldn't the riskiness of the venture as it was perceived either in 1978 or 1980 have some bearing on whether it was reasonable to assume there would be a $350 million enterprise value at the end of 10 years?

A. I'm not assuming that as a prediction of what this company will do. I am simply illustrating what the effect of the amendment is. I am comparing the before and the after in a whole range of scenarios. I'm not taking any one of those and saying that anybody would think that that is the prediction of how this venture is going to do. I don't think you can do that, in fact. (Tr. 70)

Q. In trying to show what exists, did you assume that there would be any equity at all if they failed to make their projections after 10 years?

A. I took into account that there might [not] be any equity, there might be a lot of equity, there might be a little equity. I took all those possibilities into account. I'm not projecting, I am simply analyzing a range of possible outcomes. That is what risk is all about.

(Tr. 88)

Nor did Finnerty take into account the effect of the DMC call in the first four years on the substantiality of change in NIDA's risk when the put was amended. If the product, an expensive sports car, began to catch on in the first four years after the Subscription Date, it was in DMC's interest to exercise the call and reap the upside value. If DMC did so, there would be no put in the tenth year, the preference shares having been called at least six years earlier. That call remained in place both before and after the March 1980 amendment to the NIDA put. Finnerty's report and his direct testimony did not refer to the call, and the effect it had on the package of advantages and disadvantages that constituted NIDA's risk, although the existence of that call was an important reason why NIDA's Hopkins on January 22, 1980 had viewed the put after ten years as "very much a fall back position anyway." (DX 25) This failure to consider the effect of the call caused some anomalies in Finnerty's testimony, merrily exploited by Andersen. One anomaly involved Finnerty's insistence that he had not referred to the call in his report because he considered its exercise "remote" (Tr. 131), notwithstanding that he disclaimed making predictions or projections. (Tr. 70, 88, supra) Another arose

from his claim that he had seen no 1980 communication even mentioning the call (Tr. 134), whereas the January 22, 1980 Hopkins memorandum, citing the call as a substantial reason why the put after ten years was a "fall back position," was among the nine documents on which Finnerty claimed to have relied (PX 45, App. A; Tr. 154–55), as distinct from the numerous others he saw but apparently did not rely on. (Tr. 18, 20, 22–23, 58, 67, 135–36)

As noted, if the venture was a success during the first four years and DMC exercised its call, there would be no put in the tenth year because there would be no preference stock; on the other hand, if the venture was a failure at any time before the tenth year, there would be no put in the tenth year because there would be no company. Finnerty so acknowledged. (Tr. 88–89)

In fact, there could be a negative effect on NIDA from the amendment of the put only upon fulfillment of all five of the following conditions: (i) that DMC was still in business at the ten-year mark after surviving not only the risks of a start-up automobile venture foreseen by McKinsey & Co. and announced in DMC's prospectus (*see supra* at 412), but also the effects of diminished trade and other credit imposed by negative equity resulting from Release 268; but (ii) that the automobile was not so successful in the first four years as to cause DMC to exercise its call; and (iii) that the automobile was not so successful in the next six years as to cause NIDA to exchange its DMCL shares for DMC shares; but (iv) that nonetheless DMC in the tenth year had access to $50 million in cash to pay the strike price of the put; and (v) that despite the availability of $50 million to pay the strike price of the put if NIDA could still demand it, the 7 million shares of stock NIDA could demand were worth less than $50 million, or less than about $7 per share even though DMC shares had been sold to dealers in 1979, when the success of the venture was entirely unknown, at $10 per share. (DX 11, 35; Sidorsky Aff., Ex. 10 at 4)

Finnerty testified that NIDA risked damage from the amendment if DMC's enterprise values fell in what he called the "middle range" of possibilities (PX 45 at 11; Tr. 77), meaning that the company was not so successful as to have taken the DMCL shares out of NIDA's hands, either through the exercise of the call in the first four years, or through the exchange of those preference shares for DMC shares in the next six years, but not such a failure as to have gone under before the tenth year. However, for DMC to reach that "middle range" required that all of the five conditions listed above be met. Therefore, whether or not NIDA underwent a significant change in its investment risk by giving up the cash put depended on the likelihood that all of those conditions would be met. Finnerty did not purport to calculate that likelihood:

Q. Mr. Finnerty, did you make any efforts to quantify the probabilities of the company's performance over the 10 years following 1980, winding up in sufficiently in the middle range that the call would not be exercised, and that the company would still be in existence in 10 years?

A. I did not calculate that probability.

Q. Isn't precisely that probability what an investor would want to know in appraising the risk?

A. The investor might want to look at that in addition to the analysis that I provided. The analysis I provided would enable the investor to calculate that if he wanted to do that.

(Tr. 87) How the investor, or the judge, could "calculate that if he wanted to do that" based on Finnerty's analysis was not apparent to me at the time and is not now.

Although Finnerty acknowledged that his illustrations were based on assumptions, he steadfastly maintained that the illustrations were just that—illustrations: "I'm not projecting what will happen." (Tr. 124) However, he conceded a few moments later that it was necessary to the task at hand to weigh the likelihood of various outcomes:

Q. So is it correct to say that the fairness of the representation is a function of the plausibility of the underlying assumption?

A. It's a function of the plausibility of the range of possible assumptions that are made. And as long as the range of illus-

trations captures the range of possibilities, then the conclusions that can be drawn are meaningful. I wouldn't base anything on simply one illustration.

THE COURT: Even if some of those possibilities are more implausible than others?

THE WITNESS: Yes, they are, your Honor.

THE COURT: I say even if. What you said was so long as the range is captured.

THE WITNESS: If some are more plausible than others you would want to give greater weight to those that are more plausible, your Honor.

THE COURT: Indeed. Thank you.

(Tr. 126)

DED relied in its post-hearing submissions on Finnerty's direct testimony, urging me to accept at face value Finnerty's conclusion that amendment of the NIDA put increased the likelihood that NIDA would not recover its initial investment and increased also the dispersion of possible outcomes, and therefore the risk. (DED Post–Hearing Mem. at 19–21) DED argued as well that the significance of the change in the risk to NIDA was borne out by Release 268 itself, which reclassified the preference shares as debt rather than equity and by Andersen's view that it would have to follow the requirements of Release 268 unless the NIDA put was amended. DED's argument appears to be that because Release 268 produced a change in DMC's balance sheet that had significant consequences, any response to that release effected a significant change in NIDA's investment risk. (*Id.* at 16–18) DED also cited NIDA's refusal to give up the put unless it received an additional 500,000 DMC shares as evidence that the change in risk must have been significant. (DED Reply Mem. at 8) Principal support for the last point was found in Hopkins' deposition testimony quoted above (*see supra* at 415–16), which of course was given after the underlying events had taken place and after the lawsuit was filed.

DED argued also in its reply memorandum that certain automotive industry examples are consistent with Finnerty's assumptions about "middle range" values and support the view that successful automobiles are not invariably successful within the first four years. (DED Reply Mem. at 5, 14–15)

II.

An investor must purchase or sell a security in order to recover under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 thereunder. The formula for determining whether the March 1980 amendment of the NIDA put was a purchase of a new security is the one quoted above from *Abrahamson v. Fleschner:* whether the transaction in question results in "such significant change in the nature of the investment or in the investment risks as to amount to a new investment." 568 F.2d at 868. There are two parts to that formula. The change must affect either "the nature of the investment or the investment risks," and it must be "significant."

The parties dispute both parts of that formula. DED insists that the change from a put for cash to a put for stock, even more stock, was a change in the "nature of the investment." Andersen argues that because DED relied for the value of the put on the same underlying enterprise after the amendment as it did before, there was no change in the "nature of the investment." The parties appear to agree that it was at least possible that there was a change in the risks associated with the investment, but in any event dispute whether that change was "significant."

Here, it does not appear necessary to resolve the dispute over whether the amendment of the put changed the "nature of the investment" in some abstract sense or not, because if the change in either the nature of the investment or the risks associated with it was not "significant," there was no purchase or sale of securities. One clear example of a transaction that creates a significant change in the nature of the investment is a merger, when shareholders are left with an investment in a new entity. *Securities and Exchange Comm'n v. National Securities, Inc.,* 393 U.S. 453, 467, 89 S.Ct. 564, 572, 21 L.Ed.2d 668 (1969). Another is an exchange of common stock for bonds, where "the na-

ture of the security has been changed in the sense that an interest in an ongoing concern is converted exclusively into a right to cash." *Broad v. Rockwell Int'l Corp.,* 614 F.2d 418, 437–38 (5th Cir.1980), *vacated on other grounds,* 642 F.2d 929 (5th Cir.), *cert. denied,* 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). But here, the change in the nature of the investment was only in the elimination of the right to receive cash after ten years and upon the occurrence of the five conditions discussed above, NIDA's rights otherwise having remained the same or improved. (*See supra* at 419) It is the likelihood that all five of those conditions will occur that defines both the significance of the change in the nature of the investment and the significance of the change in the risk. Here, whether a change in the nature of the investment was "significant" turns on whether the change in the risk was "significant."

To put it another way, the only change in NIDA's rights after the put was amended, other than an increase from 6.5 million to 7 million in the number of DMC shares NIDA could obtain after year four following the Subscription Date, was that in year ten NIDA could receive only the DMC stock in return for its DMCL preference shares, not cash at the rate of £1 per share plus a royalty-adjusted premium. The only way that that change in the nature of NIDA's investment could be considered "significant" is if the amendment worked a significant change in the likelihood that NIDA would receive that cash, as compared to what that likelihood had been immediately before the amendment. If there was little or no possibility that NIDA would receive that cash before amendment of the put, given the effect of the four conditions laid out above, including the effect of Release 268, then the elimination of the right to receive that cash cannot have been "significant."

As even the brief discussion above illustrates, whether an increase in risk is significant or not turns substantially on the facts of each case. Other cases may be relevant by analogy. The parties have cited numerous cases, principally for snippets of dictum tending in one direction or another but not changing the formulation in *Abrahamson v. Fles-chner, supra.* The closest analogy may be found in the panel opinion in *Broad v. Rockwell Int'l Corp.,* 614 F.2d at 437–38, where the Court found no purchase or sale in a transaction that exchanged a debenture with a conversion feature for a debenture without one. The analogy to this case, where a put with a cash redemption feature after ten years was exchanged for a put without that feature, is tempting. However, although Andersen cites the *en banc* decision in *Broad* as having vacated the panel opinion "on other grounds" (Andersen Mem. at 26), it is apparent that the *en banc* Court decided the case on the ground that there was no fraud, and not on the ground that there was no purchase or sale, which issue the *en banc* Court explicitly left open. 642 F.2d at 963 and n. 31. Andersen has simply miscited the case. No other case cited by the parties or disclosed by independent research provides substantial help in resolving the inquiry before me, which in any event turns on the particular facts of this case.

If the cases do not help to resolve the issue before the court, neither did Finnerty's testimony. Finnerty did not address the likelihood that NIDA, on the facts that existed just before the put was amended, would receive the cash in the tenth year after the Subscription Date. As Finnerty testified with respect to his own hypothetical outcomes: "If some are more plausible than others you would want to give greater weight to those that are more plausible, your Honor." (Tr. 126) However, determining what was more plausible, explaining why it was more plausible, and giving more weight to what was more plausible, was precisely what Finnerty resolutely refrained from doing.

Again, the likelihood, before amendment of the put, that NIDA would recover cash in the tenth year depended on fulfillment of all of the following four conditions: (i) that DMC would still be in business at the ten-year mark after surviving not only the risks of a start-up automobile venture foreseen by McKinsey & Co. and announced in DMC's prospectus (*see supra* at 415–16), but also the effects of diminished trade and other credit imposed by negative equity resulting from Release 268; but (ii) that the automobile

would not be so successful in the first four years as to cause DMC to exercise its call; and (iii) that the automobile would not be so successful in the next six years as to cause NIDA to exchange its DMCL shares for DMC shares; but (iv) that nonetheless DMC in the tenth year would have access to $50 million in cash to pay the strike price of the put. The significance of the negative effect on NIDA from the amendment eliminating the right to $50 million in tenth year, and therefore of the investment risk posed by the amendment, is measured by the likelihood that all four of those conditions would exist, and that a fifth condition also would exist: that despite the availability of $50 million to pay the strike price of the put if NIDA could still demand it, the 7 million shares of stock NIDA could demand after the amendment would be worth less than $50 million—*i.e.*, less than about $7 per share, even though DMC shares had been sold to dealers in 1979, when the success of the venture was entirely unknown, at $10 per share. (DX 11, 35; Sidorsky Aff., Ex. 10 at 4)

Finnerty had nearly nothing to say about the likelihood that any of those conditions would materialize. I say "nearly" advisedly, because at one point he did explain that he had not mentioned the DMC call in his report because he considered its exercise "remote." (Tr. 131) However, his analysis was otherwise unmoored from any assessment of the likelihood that these conditions would occur. His testimony is not strengthened by DED's proffer, after the hearing, of examples of newly introduced vehicles that arguably achieved only middling success after four years. (DED Reply Mem. at 5, 14–15) One example, the Corvette, does not seem to fit, having achieved great success in the fourth year. But beyond that, Finnerty did not testify, nor has DED explained, how those examples might be relevant to his scenarios. The example of a new vehicle introduced by a company with a fully developed distribution and dealer network would seem to have only slight relevance to a case about a vehicle introduced by a company with neither. In this setting, Finnerty's testimony that amendment of the NIDA put raised from 55% to 85% the likelihood that NIDA would not recover its money (Tr. 47), is simply unhelpful.

The flaw in Finnerty's analysis, and in the argument that DED erects on it, is that both depend on an assessment of relative risk of the two investments—the put before and after the amendment—wholly apart from total risk common to both, and therefore tell us nothing about the relevant issue: whether amendment of the NIDA put effected a "significant" change in NIDA's risk. Consider the following illustration having only incidentally to do with the facts of this case: The person who goes to the newsstand to buy a lottery ticket can double his chances of winning if he buys two tickets instead of just one. But only a naif would believe that if he buys two tickets instead of just one he has significantly increased his chance of winning, or conversely, that if on his way home one of his two tickets falls down a sewer he has significantly increased his risk of losing. If either your chance of winning is infinitesimal, or your risk of losing is overwhelming, neither is significantly increased for being doubled.

What, then, was the difference between the risk to NIDA of not recovering the cash put before the amendment as compared to the risk after? Here it appears to me that whether one considers the statements of the participants at the time, or simply the objective facts, the difference in risk was infinitesimal.

As noted extensively above (*see supra* at 413–15), the analysis of the participants at the time the events were happening showed that the likely effects of Release 268 on DMC's short-term prospects were such that NIDA had no realistic possibility of seeing any cash at the end of ten years, that therefore NIDA had no choice but to agree to eliminate the cash payment after ten years, and that NIDA recognized at all times that its fortunes were tied to DMC's. As Hopkins put it, before pending litigation could have influenced word, thought or deed: "If the Company is reasonably successful, this will leave us in a stronger position; if not, we will not be any worse off." (DX 36 at 2) Which is to say, renegotiation of the put did not significantly increase NIDA's risk.

The objective facts as they existed at the time bear out that conclusion. Again, NIDA had no chance at all immediately before the

March 12, 1980 transaction of recovering the cash value of the put unless the four conditions discussed above were fulfilled. *See supra* at 421–22. That set of conditions was, to say the least, unlikely of realization just before the put was amended. But the relevant question is whether NIDA's fortunes were made significantly riskier by the amendment. Which is to say, was receipt of 7 million shares in the tenth year significantly less likely to yield $50 million in value, after the negative effects of Release 268 had been eliminated, than the right to receive $50 million in the tenth year with the negative effects of Release 268 in place? It was not. In fact, the amendment placed NIDA in a stronger position because, although the risky venture on which its fortunes depended remained risky, at least it no longer faced the certain damage that would have been inflicted by Release 268.

DED argues that it is wrong to start the analysis by recognizing that NIDA's investment was risky to begin with, because the logical end will be an unacceptable result: that purchasers of risky securities who need protection most will receive none from the federal securities laws, their position being hazardous by definition to start with. (DED Post–Hearing Mem. at 21) But DED's horrible consequence does not loom because the investor in even a risky enterprise is protected against materially misleading statements when he makes his initial investment. However, the law requires that before any later transaction related to that investment can itself be characterized as a new investment, that transaction must alter the risk "significantly" to the investor's detriment. It is DED's logic that leads to the unacceptable result—namely, disregarding the requirement that a change in risk be "significant" before the transaction in which that change occurs can be considered a purchase or sale of securities.

Also, DED overlooks that it is not merely the high risk of the initial investment that leads to the conclusion that there was no significant increase in the risk when NIDA's rights after ten years were changed to eliminate the cash put but to add 500,000 DMC shares. Rather, it is the effect of Release 268, in combination with the earlier risks, that yields that conclusion.

Here, it bears mention that I have purposely omitted from consideration in both the pre-amendment scenario and the tenth year scenario a factor strongly pressed by Andersen—namely, the British government's reluctance, and therefore NIDA's, to endanger the project by pressing NIDA's economic rights to the hilt. The standard prescribed by *Abrahamson* seems to me an objective one: significant increase in risk, without regard to the likely subjective reaction and consequent conduct of a particular investor subject to that risk. Thus, for example, I did not consider the likelihood that NIDA might decline to exercise the put in the tenth year if doing so would jeopardize the future of the Northern Ireland plant and the employment it provided.

However, the British government's political agenda in this project is relevant in another respect. It defeats DED's attempts to minimize the riskiness of the DeLorean project with the suggestion that the British government would not have gone into the project with high expectations of failure, and would not have taken the trouble in 1980 to obtain expert advice if the DeLorean project seemed likely to fail. (*E.g.,* DED Post–Hearing Mem. at 21–22) To the contrary, there was good reason to believe that the British government accepted an enormous economic risk in an effort to achieve what it regarded as an enormous political gain. Nor is there anything inconsistent with recognition of that risk in NIDA's consultation with counsel and investment bankers before it agreed to accept amendment of the put. A government entity would invite harsh criticism by entering into any financial transaction without benefit of expert advice. The point is not that NIDA sought advice and considered the matter carefully, but rather the outcome of that advice and consideration: the amendment involved no significant increase in risk.

Nor is it meaningful that Hopkins initially rejected the idea of simply eliminating the cash payment after ten years with no corresponding benefit to NIDA (DX 24; *see supra* at 413–14), and that NIDA eventually obtained a 500,000–share quid for the quo. DED argues that NIDA would not have gotten the right to 500,000 more shares of DMC stock unless it was being asked to accept a

significantly higher risk, for which it was being paid. Release 268 put DMC over a barrel. The company was facing substantial near-term distress if it did not succeed in changing the accounting treatment of the DMCL preference stock. That NIDA was able to extract about 7.5% more stock as the price for giving up the cash payment in the tenth year seems a measure more of NIDA's bargaining position than of the increase in its risk.

I am not persuaded by DED's argument that because Release 268 produced a change in DMC's balance sheet that had significant consequences, and because Andersen felt obligated to follow that release and impose those consequences, the amendment to the NIDA put in response to that release must have effected a significant change in NIDA's investment risk. (DED Post–Hearing Mem. at 16–18) That is a non-sequitur. Accounting rules, and the obstacles they may present to the solvency and fortunes of a company, are one thing; whether the response to those accounting rules increases the risk of an investment is something else.

Hopkins' testimony, heavily relied on by DED (PX 49 at 836–37; see supra at 415–16), does not suffice to create an issue of fact on the riskiness of the March 12, 1980 amendment to the NIDA put, even assuming without deciding that whether or not there was a purchase or sale is a jury issue.[6] To the extent there is anything in Hopkins' testimony, given after the lawsuit was filed, that conflicts with his words and deeds at the time the underlying events were ongoing, it is what he said and did earlier and not what he said later that deserves weight. Cf., Fleming v. New York Univ., 865 F.2d 478, 485 (2d Cir.1989) (statement submitted following adverse judicial finding, conflicting with earlier statement, "treated with some suspicion"); Reisner v. General Motors Corp., 671 F.2d 91, 93 (2d Cir.), cert. denied, 459 U.S. 858, 103 S.Ct. 130, 74 L.Ed.2d 112 (1982) (disregarding affidavit that conflicted with earlier testimony).

Because the March 12, 1980 amendment to the NIDA put did not significantly increase the risk NIDA already faced in connection with its £17,757,000 investment, that amendment was not a purchase or sale of securities by NIDA. Therefore, DED's federal securities claim based on that transaction, its last federal claim in this lawsuit, must be dismissed.

### III.

■ "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988). The parties hotly dispute whether this case is unusual in ways that recommend the continued exercise of pendent jurisdiction over plaintiffs' state-law claims.

Both DED and the Trustee press arguments of judicial economy and fairness deriving principally from what they assume to be the relative ease of bringing the case to trial in this court as compared to state court. The Trustee's action has been pending in this court, they point out, since 1984, DED's since 1985. In that time, they argue, this court has expended effort to become familiar with the legal and factual issues that would have to be duplicated by a state court, and the parties would expend effort and suffer delay if the state-law claims must be refiled in state court.

---

**6.** Andersen has contended that even if there are disputed issues of fact surrounding whether NIDA's risks were significantly increased by the amendment to the put, the court has the power to decide them on this motion because jurisdictional issues may be resolved by the court, citing Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 242 n. 2 (2d Cir.1984) (domicile/personal jurisdiction), and Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir.), cert. denied, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) (whether interests in land and notes were securities).

However, even Williamson, on which Andersen relies, shows that when the question of jurisdiction raises issues of fact that may reach the merits of the case, a court should not dismiss for lack of jurisdiction. Williamson, 645 F.2d at 415; see also Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1188–89 (2d Cir.1996) (tracing distinction between jurisdictional and merits dismissal). These issues need not be reached here because there are no disputed issues of material fact for a jury to resolve.

Those arguments considerably overstate reality. Yes, these cases have been pending for an alarmingly long time. But they were transferred to my docket only in 1994. The judicial investment in them before 1994 is irretrievably lost. There have not been numerous conferences and hearings in this case since 1994. Whatever familiarity I have with the legal and factual issues is derived from papers and is revealed in the opinions filed since 1994, which are available to be read by any judicial officer. The voluminous discovery taken in these cases would not be wasted if the cases were refiled in state court; it would be available for use there.

A survey of the cases in which courts have retained jurisdiction over pendent state-law claims after the dismissal of federal claims, and on which plaintiffs rely to support their request that the court retain jurisdiction here, discloses telling distinctions between those cases and these. Thus, taking plaintiffs' strongest case first, in *Newport Ltd. v. Sears, Roebuck & Co.*, 941 F.2d 302 (5th Cir.1991), *cert. denied*, 502 U.S. 1096, 112 S.Ct. 1175, 117 L.Ed.2d 420 (1992), a district court had dismissed federal claims on the eve of trial, after submission of a pretrial order, and then simply dismissed the state-law claims based on the following one-sentence analysis: "Where federal claims are dismissed before trial, pendent state claims should be dismissed as well." *Newport Ltd. v. Sears Roebuck & Co.*, 739 F.Supp. 1078, 1084 (E.D.La.1990). The Fifth Circuit reversed, noting particularly that the refusal "to hear this case on the eve of trial constituted an abuse of the trial court's discretion." 941 F.2d at 307–08. In *Raucci v. Town of Rotterdam*, 902 F.2d 1050 (2d Cir.1990), and *Enercomp, Inc. v. McCorhill Publ'g, Inc.*, 873 F.2d 536 (2d Cir.1989), the Court of Appeals for this Circuit upheld as reasonable the decisions of two trial courts to retain jurisdiction of state-law claims after federal claims were dismissed. In *Raucci*, the Court cited the "readiness of the case for trial," 902 F.2d at 1055; in *Enercomp*, the Court stressed that dispositive motions "were not filed until the very eve of trial" and that the case had been "scheduled for trial within days." 873 F.2d at 546.

District court cases in which jurisdiction over state-law claims was retained after dismissal of federal claims show principally the same pattern. In *Ryan v. New York State Thruway Auth.*, 889 F.Supp. 70 (N.D.N.Y. 1995), the case was "trial ready." *Id.* at 80. The decision in *Philan Ins. Ltd. v. Frank B. Hall & Co., Inc.*, 786 F.Supp. 345 (S.D.N.Y. 1992), was rendered on February 28, 1992; the case was scheduled for trial on March 23, 1992. *Id.* at 345, 349. In *Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 147 (S.D.N.Y.1989), it is not clear how close to trial the case stood at the time of decision, but neither is it relevant; the court retained jurisdiction over the state-law claims that overlapped federal claims in that case, 728 F.Supp. at 147, and then granted summary judgment dismissing the state-law claims as well. *Id.* at 156. In *Philatelic Found. v. Kaplan*, 647 F.Supp. 1344 (S.D.N.Y.1986), the court appeared to believe that "particular circumstances" including "anticipated completion of discovery in the near future, the familiarity of the court with the issues and all the proceedings heretofore had," which proceedings were not specified, warranted retention of jurisdiction. *Id.* at 1348.

The cases at bar are not on the eve of trial. They are not on the eve of the eve of trial. It is uncertain what discovery, if any, remains, but even if, as seems likely, there is no further discovery to be taken, it is not discovery that is likely to consume the greatest judicial time and effort. At a minimum, what lies ahead is the winnowing of plaintiffs' factual allegations to what is essential, and the crafting of a pretrial order that will limit and concentrate the proof, both documentary and testimonial. Which is to say, what lies ahead is the arduous task of reducing this case from a miasma of frequently rhetorical and conclusory allegations, *see, e.g.*, *Department of Econ. Dev.*, 924 F.Supp. at 469–70 (table reflecting 15 different permutations of DED's now-dismissed RICO claim), 924 F.Supp. at 474–75 (describing DED's reliance on vehemence in place of clarity), and a Niagara of paper, to a manageable and focused dispute. That will be at best a time-consuming process, and one in which DED in particular already has shown itself to be a singularly intractable participant. *Id.* at 458 (describing DED's 225–page Second Amended Complaint with narrowed line spacing and margins, in simultaneous defiance of Fed.

R.Civ.P. 8(a)[7] and the court's admonition to pare down allegations).

In sum, there is little judicial economy to be achieved by retaining these cases in this court, and little unfairness in compelling plaintiffs to refile in state court and, if appropriate, to file a note of issue within 40 days so that these cases can be promptly scheduled for trial. N.Y.C.P.L.R. 3402 (McKinney 1992).

For the above reasons, defendants' motion for summary judgment dismissing the remaining federal claim is granted, and the remaining state-law claims are dismissed for lack of subject matter jurisdiction, without prejudice to refiling in another forum.

SO ORDERED.

7. "A pleading which sets forth a claim for relief ... shall contain ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief...."